**MOHAWK PAPER MILLS, INC.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 65–C–87.**

United States District Court
N. D. New York.

Nov. 18, 1966.

John T. DeGraff, DeGraff, Foy, Conway & Holt-Harris, Albany, for plaintiff.

Marvin Joseph Garbis, Dept. of Justice, Washington, D. C., Mitchell Rogovin, Asst. Atty. Gen., David A. Wilson, Jr., Henry G. Zapruder, Attys., Dept. of Justice, Justin J. Mahoney, U. S. Atty., Washington, D. C., for defendant.

## OPINION

MOORE, Circuit Judge (sitting by designation).

The plaintiff, Mohawk Paper Mills, Inc. (Mohawk), brings this tax refund suit to recover taxes paid because of income tax deficiencies assessed against Mohawk for the years 1959, 1960 and 1961 on the theory that Mohawk had accumulated earnings in these years in violation of Section 531, Internal Revenue Code, Title 26. This court has jurisdiction of the suit under 28 U.S.C. § 1346.

Mohawk paid under protest accumulated earnings taxes and interest in the sum of $615,829.96 upon alleged excess accumulations as follows:

| Year | Alleged Excess Accumulations | Tax Imposed | Interest |
|------|------|------|------|
| 1959 | $ 465,519 | $168,225.09 | $ 48,193.03 |
| 1960 | 385,571 | 148,490.80 | 33,630.11 |
| 1961 | 504,903 | 186,279.27 | 31,011.66 |
| | $1,355,993 | $502,995.16 | $112,834.80 |

Mohawk's claim for refund was disallowed on February 18, 1965, and this suit was timely filed on February 26, 1965.

### The Applicable Statutes

The statutes governing the imposition of an accumulated earnings tax are sections 531, 532, 533, 535 and 537 of the Internal Revenue Code of 1954, 26 U.S.C. 1958 ed. and Treasury Regulations, Sec. 1.533–1, 1.533–3, 1.537–1, 26 C.F.R. The facts developed upon the trial must be reviewed against the background of these sections.

First, the tax* applies to corporations "availed of for the purpose of

* Wherever used unless otherwise qualified, "tax" means "accumulated earnings tax".

avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed" (§ 532).

Second, Sec. 533, EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) *Unreasonable Accumulation Determinative of Purpose.*—

For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

Third, "the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business" (§ 537). Lastly, the Regulations specify certain evidentiary guidelines intended to be helpful in arriving at the conclusion of the existence or non-existence of the proscribed purpose. Despite specific examples in the Regulations, it is fundamental that "Whether or not such purpose was present depends on the particular circumstances of such case." Sec. 1.533-1(a) (2). Factors to be considered are "Dealings between the corporation and its shareholders", "withdrawals by the shareholders as personal loans", "expenditure of funds by the corporation for the personal benefit of the shareholders", "investment by the corporation of undistributed earnings in assets having no reasonable connection with the business", "the extent to which the corporation has distributed its earnings and profits" and "the accumulated earnings and profits of prior years".

To "justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulations, and the corporation must have specific, definite and feasible plans for the use of such accumulation".

The Regulations are also specific as to the extent of the proof to be considered in determining "reasonable anticipated needs". Thus, although "[c]onsideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year", nevertheless "subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated". Sec. 1.537-1 (b).

*Pre-1959 History of Mohawk*

Mohawk operates two mills for the manufacture of paper, one at Waterford, New York, built about 1875, the other at Cohoes, New York, built in 1915–16. The present Mohawk company acquired the properties upon foreclosure in 1931. For some ten years prior thereto, the mills had been in receivership and had been operating at a loss. In fact, it was this situation which accounted for the advent of George E. O'Connor, Esq., and some of his family in the paper business. Mr. O'Connor, a practising lawyer for some years, had been the attorney for the then Mohawk receivers. His father who held a mortgage on both mills was the largest creditor.

The present Mohawk commenced its existence (1931) with a capitalization of $2,500 (500 shares of no par common stock) owned by Mr. O'Connor, Senior, which shares were given a few years later to Mr. O'Connor, Junior (George E.), who still retains them. For all practical and legal purposes, Mr. O'Connor is the sole proprietor. The original working capital came from a $100,000 mortgage loan and loans from the O'Connor family.

The financial success (or, better, lack thereof) between 1931 and 1945 fluctuated rather widely. During the Depression years (roughly 1931–40), small profits were realized in two years and losses were incurred in eight years, the net result being a loss of $251,190.65. The next five years saw some improvement; a small loss for one year and an overall profit of $153,272.68.

Net sales of Mohawk's products from 1932 through 1945 increased from $413,609 in 1932 to $2,731,423 in 1945; in tons of paper correspondingly from 5,140 to 14,120. During this period, $332,347 were added to fixed assets. No dividends were paid. The Mills, both plant and equipment, were obsolete and, as a result of financial reverses, in bad repair.

After World War II, a marked improvement is noted. For the fifteen years 1946 through 1961, net sales increased from $3,694,887 to $10,777,765 in 1961; tons of paper from 16,895 to 26,881.

These increases were not fortuitous but reflect managerial policy in discarding unprofitable items and concentrating on profitable specialty items. However, the tonnage increase could not have taken place had not the antiquated machinery been improved by more modern equipment and large sums devoted to repairs and maintenance. From 1931 to date, virtually as the sole owner, Mr. O'Connor has given his time, energy and from the results achieved obviously his ability to Mohawk's maintenance and expansion.

Although only three years (1959, 1960 and 1961) are involved in this refund suit, they do not stand in isolation but must be viewed as a part of Mohawk's industrial history from 1931 to date. Furthermore, in weighing the proof, consideration must be given to the fact that Mohawk is and has been not only a family corporation but in many ways a one-man corporation. Decisions which, in the case of industrial giants, might well be found recorded in engineering committee minutes, reports, directors' minutes and countless inter-office memoranda would not necessarily be so memorialized in a situation in which one man had the responsibility of operating a company with limited funds and often on a hand-to-mouth basis.

## 1954 to 1959

The activities of Mohawk in the years immediately preceding the tax years (1959–1961) bear directly on the reasonableness of any accumulations during the tax years. From 1954 to 1959, there were additions to fixed assets of some $1,744,714. Repairs accounted for an even larger amount. Net sales jumped from $5,864,796 to $10,540,905 in 1959. These results were obtained by such additions and betterments to its existing equipment as its resources permitted.

## 1958 to 1964

Although the ultimate acquisition of a new and more modern paper machine was contemplated as essential to meet competition and to stay in business, there were many other items which required priority attention. Expansion at the Waterford mill was limited by its site between river and canal. After Mohawk acquired title to the bed of the canal in 1958, a program of expansion and modernization was instituted. These included draining the canal, the building of a double truck dock, the construction of buildings for various production purposes and for the contemplated new machine. Some $2,600,000 was expended in the 1958–1962 period for these purposes including $1,200,000 for the expansion of the finishing room capacity. Illustrative of physical expansion at Waterford are the cutter building ($169,299), the converting building ($409,891), modernization of machines ($419,586), heater room ($99,539), new dam ($58,250) and deculator ($47,067).

At Cohoes a cutter and office building and equipment, a trimmer building and finishing room equipment accounted for expenditures of $630,920, modernization of paper machine ($196,652), water filtration plant ($105,531), Sveen Pedersen installation ($96,139), deculator ($36,614), and electric power substation (order placed 1961, $76,270).

## Reasonable Needs (1959–1961)

■ The first question to be answered is, "Was Mohawk availed of for the purpose of avoiding the income tax with respect to its shareholders" [namely, Mr. O'Connor]? "The" purpose must be further limited to the inquiry: was it even "a" purpose?

The proof burden is upon Mohawk. It must establish by a preponderance of the

evidence that "the deficiency was factually incorrect or that the amount paid exceeded the true tax liability." United States v. Lease, 346 F.2d 696, 700 (2 Cir., 1965). Mohawk, therefore, must prove (1) that there was no tax avoidance purpose, and (2) that earnings were not accumulated beyond its reasonable business needs. If there were any such accumulation, the "purpose to avoid" is thereby determined unless Mohawk by a preponderance proves to the contrary (§ 533).

Although the Government (in Brief) invites a consideration of the accumulated earnings tax in connection with the entire statutory scheme relating to the taxation of distributions of corporate profits, the temptation to expand a judicial opinion into a philosophical dissertation (even assuming the capacity so to do) must be resisted. Certain irreconcilable conflicts, however, must be noted. To support national government, the Treasury must endeavor to realize the maximum revenue from taxes assessed upon the people. Therefore, in most instances, the characterization of profits as income instead of capital gains and their immediate distribution for collectible tax purposes are to be preferred. To the legislator, the protection and encouragement of the small businesses in his community is of no small interest. Witness the Small Business Act. To the Antitrust Division of the Department of Justice, the preservation of competition and the assurance that the small business is given a fair opportunity to compete with the large occupies the time and attention of its large staff. And finally the business economist will undoubtedly say that true competition will depend in large part upon comparable manufacturing and marketing facilities. In short, except for one noteworthy Biblical exception, the Davids of modern business will have difficulty in competing with the Goliaths unless they are given the opportunity to acquire matching strength—*mutatis mutandis,* of course. That a fair resolution of these conflicts has not as yet been found should cause the courts no particular chagrin when throughout the ages renowned physicists have failed to solve the problem of the irresistible meeting the immovable.

In deciding between Mohawk and the Government, resort must be had to certain factual foundations. Relying upon that advantage so frequently stressed by appellate courts in giving credence to a trial court's appraisal of the strength of the testimony, I am convinced beyond a reasonable doubt from the pre-trial depositions, the answers to interrogatories, the trial testimony, the exhibits, from seeing and hearing Mr. O'Connor and from the physical inspection of the Waterford and Cohoes mills made by court and counsel that Mohawk in its use and preservation of its earnings was motivated by a desire to maintain and improve its plant and equipment and in this way to be able to compete successfully in the highy competitive specialty paper industry with its several competitors then currently (1959–1961) and in the future.

Mindful of the importance of the revenue, I would think that from a national welfare point of view the continued and prosperous condition of Mohawk is a factor not to be disregarded. Here are two small communities, the residents of which to the extent of several hundred employees obtain their daily employment at the mills. Their incomes from wages are taxed. Their purchases enable other businesses to exist. Their very employment removes them from the lists of nationally unemployed. Yet important though these factors be, if concealed under this gloss there be a purpose to avoid lawful taxes, the Government must prevail.

In examining the merits, reliance can be placed upon the selection by the Government of its arguments for purposes of this suit. It must have carefully considered all the facts available to support its position and selected the points which it believes will establish Mohawk's inability to recover.

*The Issuance of, and the Dividends paid on, the Preferred Stock.*

The Government finds the issuance of twenty-two classes of Mohawk preferred stock each to a member of the O'Connor family more than a suspicious circumstance. And so it would be, were the particular purpose of the issuance to be ignored. In the first place, it is scarcely reasonable to attribute a 1959–1961 intent to avoid taxes to a plan which originated in 1948 long before anyone—even the sole common stockholder, Mr. O'Connor—could have known that the company would prosper during a three-year period commencing eleven years later.

In April 1948, Mr. O'Connor, as President of Mohawk, as the sole owner of all the outstanding common stock, made a full and fair disclosure to the Bureau of Internal Revenue of his contemplated plan "to provide at this time a source of income and support for my wife, my three minor children, one brother and two sisters." He outlined the plan for the issuance to him of 2,000 shares of preferred stock which in turn would be given by him to these family members in compliance with the gift tax law. Mr. O'Connor sought an advisory opinion as to whether such an issue would be "income-taxable." The Treasury sought additional information which was supplied. In May 1948, the Treasury with certain qualifications not here relevant "held that no taxable gain will be recognized to Mr. O'Connor as a result of the receipt by him, as a dividend, of 2,000 shares of new preferred stock, * * *."

In November 1949, desirous of issuing 4,000 additional preferred to family members, Mr. O'Connor again sought Internal Revenue advice, which in December 1949 was given to the same effect as in the previous year.

Dividends on the outstanding preferred have been paid at the rate of $10 a share from 1948 on, and in the year 1959 amounted to $90,000, in 1960 to $140,000, in 1961 to $140,000, and in 1962 to $170,-000.

I find no relationship whatsoever between the issuance of the preferred stock and the payment of dividends thereon and any purpose to avoid taxes. The fact that no dividends were declared on the preferred temporarily held by Mr. O'Connor or on the common owned by him will be discussed under a separate subject—accumulations.

*Earnings Accumulations (1959–1961)*

The Government asserts that Mohawk during these years accumulated earnings beyond the reasonable needs of its business and cites total cash and equivalent of $1,586,747, $1,309,277 and $1,732,302 as of December 31st for the years 1959–1961, respectively. Such part of these amounts as were invested on short-term securities for all practical purposes were the equivalent of cash and do not fall into the category of "assets having no reasonable connection with the business."

*Charitable Contributions*

I do not regard Mohawk's rather small contributions to charities and somewhat larger contributions to the Tekawitha Foundation as proof that Mohawk was surfeited with cash or, if its business needs were real, that it should have foregone the luxury of charitable contributions. Corporations customarily make such donations for purposes of community good will.

*Interest-Free Loans*

Loans to nonshareholder employees without interest and to certain shareholders were in such comparatively trivial amount in contrast to Mohawk's plant and equipment needs that they, too, fall into the customary good will category although such loans should be carefully scrutinized.

*Mohawk's Business Needs*

To ascertain whether Mohawk's accumulations were for real business needs or were concocted as a matter of hindsight upon the arrival of an Internal Revenue Agent examining into accumulations requires an investigation into Mohawk's plans and expenditures both before and after the tax years in question.

*The New Paper Machine (Waterford)*

Prior to and during the tax years in question, Mohawk not only envisioned

but was well on its way to the completion of facilities for a new paper machine, an addition vital in Mr. O'Connor's judgment to the successful continuance of Mohawk's operations. The estimated cost of machine and structures required therefor was some $3,750,000. Preliminary drawings and cost estimates were obtained. However, the mere acquisition of a machine did not stand in isolation. Many building additions and alterations first had to be made for an efficient and integrated operation. The cash and equivalent of some $1,500,000 to which the Government points during these years was obviously inadequate for the completion of the mill in any single year. However, construction progressed on a step-by-step, year-by-year basis through 1957–1961 and thereafter. The work is still in progress. During this period, other essential items had to be given priority as a matter of business judgment and necessity which caused some deferment in the construction of the new machine. These necessitous diversions of Mohawk's funds from the new machine project (and the consequent postponement of its completion) would scarcely be probative of accumulations beyond the reasonable needs of the business. Additions to fixed assets for the years 1958–1961 amounted to some $1,750,000.

*Other Needs*
*Working Capital*

Mohawk did not set aside as permitted by law a separate depreciation reserve but carried this deduction under "working capital". Thus, working capital had to finance its daily operations as well as its additions to fixed assets. Taking either an industry rule of thumb, gauge of percentage of sales, an operating cycle, or a ratio of current assets to current liabilities approach, Mohawk's working capital quite apart from fixed asset additions needs was no more than necessary for its business needs.

*Stream Pollution, Pensions, etc.*

Mohawk has introduced a mass of figures and cost estimates of items which may be imminent as capable of requiring large financial outlays. There is no doubt that such items as stream pollution and the funding of pensions are not figments of Mohawk's corporate or Mr. O'Connor's personal imagination. They were realities at the time of the alleged accumulations. The court can take judicial notice of the stream pollution situation and recognize the state court decisions on the subject.

The judgment of the employees in preferring to have Mohawk use its funds for plant improvement to assure them of jobs is to be commended as an example of apparently good labor-Management relations. However, Mohawk's recognition that there is a current trend towards funding cannot be termed to be unrealistic.

It would prolong this opinion unduly to consider item by item each phase of Mohawk's operation and the funds required therefor. Suffice it to say that the total of items then current in 1959–61 and in prospect would have called for sums vastly in excess of the amounts allegedly accumulated unlawfully. Nor is it necessary to pass upon the reality or reasonableness of each and every item in any year other than the tax years in question here.

■ Adverting briefly to the Government's specific arguments, I find that Mohawk's failure to pay dividends on Mr. O'Connor's common stock in 1959–61 was caused by a need to conserve cash for the reasonable needs of the business rather than being a purpose to avoid personal income taxes on dividends. Nor do I accept the suggestions that company sale or estate tax possibilities motivated accumulations.

■ The contention that Mohawk did not really contemplate building a new paper machine is completely refuted by the facts. That no specific machine of a specific width was then on order does not prove the lack of need or intention. With the rapid advances in machine technology, there would have been no point in deciding on a particular machine in 1959 when it was known that the finances

were then inadequate for its purchase. Consideration, even if a fact of a 110″ machine was not final. The ways of a big business are often little different from the ways of a small citizen who, hopeful of having a home or an automobile, will save for that definite purpose. The intent is just as real even though he does not know what future real estate development or what model car will be the recipient of his savings.

■ The thought that Mohawk had an ample line of credit and could have borrowed to meet its needs is rejected. Many a successful corporation can boast of no outstanding debt. Pay-as-you-go philosophies have been advanced as praiseworthy (even though not always achieved) by officials of Government. Mohawk had experienced the dire results of debt in its receivership days. It would be an unseemly judicial pronouncement to criticize Mr. O'Connor's determination to buy only that for which he could pay out of Mohawk's treasury.

As to definiteness of plan, I find that there was both plan and action taken toward its consummation. Dixie, Inc. v. Commissioner, 277 F.2d 526 (2 Cir., 1960). The many physical additions to plant and equipment during the tax years attest to "action taken".

I am aware of the fact that Mohawk's repairs and maintenance items are not to be confused with accumulated earnings, that its accounts receivable were large and showed an extraordinary record with respect to absence of bad debts and that many of the items listed by Mohawk as requiring accumulation might well be placed in a different category. These facts, however, do not dim the spotlight of our present analysis, the focal point of which is: were these accumulations motivated by a purpose of tax avoidance? Parenthetically and conversely, this is not a case in which the family corporation had been used as a veil to conceal use of corporate funds for family purposes—a veil which if too diaphanous the courts without regard to modesty should not hesitate to rend asunder. But again this is definitely not such a case.

*The Law*

The legal principles bearing upon earnings accumulations, lawful and unlawful, have been fully set forth in the respective briefs of counsel. Each case presents a situation indigenous unto itself and cannot be decisive in any other situation.

■ Fortunately for decision here, the only question to be decided is: Were the earnings of Mohawk in the years 1959–1961 unlawfully accumulated? In my opinion, the answer by more than a preponderance of the evidence is "no". I am thus able to avoid and to leave to some much wiser court the problem of how large can the small business become by building itself up to great size out of its own earnings. In theory, short of invading the monopoly field, the ability of the small to become large should be limitless. If there are to be limitations, they should be imposed by the legislative rather than the judicial branch of government. The courts should be arbiters not dictators. Too frequently, courts are forced into situations (often not to their liking) merely because some agency of government has to decide. But if the legislative branch wishes to decide that 10% or 50% or any other percent of earnings must be distributed by way of dividends, this is their prerogative. As long as the law reads as it does, and did at the time Mohawk decided to accumulate for the reasonable needs of its business, it should be followed by the courts.

This decision shall constitute the findings of fact and the conclusions of law.

Judgment for plaintiff.