**William J. SORGEL et al., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 69–C–142.**

United States District Court,
E. D. Wisconsin.

April 27, 1972.

John D. Cahill, and Bruce C. O'Neill, Milwaukee, Wis., for plaintiffs.

Johnnie M. Walters, Asst. Atty. Gen., and Risden C. Ackerman, Atty. Dept. of Justice, Washington, D. C., and David J. Cannon, U. S. Atty., Milwaukee, Wis., for defendant.

1

## OPINION AND ORDER

REYNOLDS, Chief Judge.

This is a tax refund suit brought in this court pursuant to Title 28 U.S.C. § 1346(a) (1). Taxpayers claim that the Government improperly assessed a Title 26 U.S.C. § 531 accumulated earnings tax on its earnings for the years 1964 and 1965. The disallowance of certain demolition losses and leasehold amortizations is also challenged. The case having been tried before me, I now set forth my findings of fact and law, findings which lead me to conclude that the § 531 tax was improperly assessed but that the demolition and amortization expenses were properly disallowed.

## SECTION 531 ASSESSMENT

### Facts

*The Parties.* Prior to 1966 the plaintiff William J. Sorgel owned 63.293% of the outstanding common stock of Sorgel Electric Company, plaintiff Fred F. Koeper owned 33.413% of the stock, and the William J. Sorgel Children's Trust owned the remainder—3.294%. On August 3, 1966, Sorgel Electric Company was liquidated and dissolved, and the assets were distributed to the shareholders. After an audit by the Government, deficiencies in taxes were found against Sorgel Electric Company in the amount of $97,220.35 for the year 1964 and $177,628.61 for 1965. Since Sorgel Electric Company had been liquidated, the deficiencies were assessed against the plaintiffs as transferees of the corporate assets. Plaintiffs paid the deficiencies, filed a claim for refund which was disallowed, and then filed the complaint in the case before me today.

*General Corporate History.* Sorgel Electric Company, a Milwaukee firm, was at the time of its sale in 1966 a leading manufacturer of electric transformers, ranking behind only General Electric and Westinghouse in customer preference. It was founded by the father of the plaintiff William *J.* Sorgel —William *R.* Sorgel. Mr. Koeper, the other plaintiff, began working at Sorgel Electric Company in 1923 at age 15 as a janitor and errand boy. When the depression hit, the elder Sorgel sold his home, moving his family into a cottage which lacked both electricity and running water, so that the equity might be used to keep his business afloat. Mr. Koeper stayed on through this period and for two years was the only shopman in the plant.

Sorgel Electic Company plunged to its business low in 1933 when it did a total business of $25,000. During the late 1930's, however, business began to improve, and in 1940, in anticipation of a wartime business expansion, the company moved to its present location. A year later the plaintiff William J. Sorgel joined the firm, and a year after that Mr. Koeper was made a corporate officer. Unexpectedly business remained static during the war. However, in 1947 the company began a decade of growth, culminating in 1957 when the firm had a net profit of $214,519.30. In that year the firm built an addition to the plant, financed in part by a quarter of a million dollar mortgage. In 1958, however, the company's growth suffered a sharp reversal with profits dropping to less than 40% of that of 1957. Not until 1964 was the 1957 level again regained and surpassed. In 1966 the company was sold but continued to operate under new ownership with Fred Koeper as president. Aided by ample financing, the new Sorgel Electric Company grew from approximately $5,000,000 in sales in 1965 to $14,000,000 in 1970.

Essentially the § 531 case revolves around the reasonable business needs of Sorgel Electric Company as of December 31, 1964 and 1965. As the Government in its post-trial brief and proposed findings of fact has conceded that a § 531 tax was inappropriate for 1965, I will go into detail only with regard to 1964.

*1964.* Ever since the 1950's, Sorgel Electric Company had been hindered by a lack of adequate plant facilities. Not only did a lack of space force the subcontracting of certain items, but it also led to excessive backlog, slow delivery,

and outright refusal of some transformer orders. In May 1963, for instance, the best delivery time was one week and the longest six to eight weeks. Half a year later it was two weeks and nine to twelve weeks. By April of 1965, three weeks constituted the shortest delivery time and fourteen weeks the longest. In that time was of the essence in this line of business, a clogged workshop spelled disaster. Indeed, in 1963, a salesman quit the top distributor of Sorgel transformers, because while he could get the orders, Sorgel could not deliver. By 1966 the situation was so bad—six weeks was by then the shortest delivery time—that Sorgel's top distributing company dropped the Sorgel line.

Sorgel, of course, was not unaware of the problem, and prior to 1964 the firm had looked into the possibility of moving the plant to the outskirts of Milwaukee. By 1963, however, Sorgel began to buy up land around its existing plant, and by the end of 1963 it had decided to expand rather than relocate. An architect was hired sometime in mid 1964, and plans were drawn for a 140 foot building by late November. Even before November, however, it was realized that a 140 foot building was inadequate and that a 200 or 260 foot structure would be needed. Anything over 140 feet, however, entailed receiving permission from the City of Milwaukee to close an alleyway dividing Sorgel's newly-acquired lots. After informal contacts with the city indicated a favorable attitude, a letter requesting the alley closing was drafted in early November. Sometime in November or early December, the architect was asked to draw up plans for a 260 foot building. In December land surveys were begun, bids were requested both for an incinerator and a crane for the 260 foot addition, and the final land purchase was made. By January of 1965, the equipment bids were in, and existing buildings on the land slated for the new addition were demolished. By February the final plans on the 260 foot addition were off the drawing boards, and by March the City Council formally informed Sorgel that the alley could be closed. Construction not only began in 1965, but the partially constructed addition was in actual use by the end of that year.

During the latter part of 1964, cost estimates for constructing and equipping the new addition were made, and it was figured that roughly half a million dollars would be needed for a 140 foot expansion and about three-quarters of a million dollars would be needed for the larger 260 foot structure. The corporation intended to self-finance as much of the new addition costs as possible. This conservative approach stemmed from depression experience and the fact that on the occasion of the two other times (1940 and 1957) when plant expansion was undertaken, business failed to improve or declined. It stemmed also from the fact that others in the transformer business were in trouble at the time. For instance, during the first half of the 1960's, firms roughly the size of Sorgel went bankrupt. The cost of the addition came to approximately a million dollars, and Sorgel found it necessary to borrow $300,000 in 1966.

At the same time that Sorgel Electric Company was taking steps to correct its clogged workshop, it also became evident that a severe constriction of vital raw materials was in the offing. Copper and steel each make up about one-third of a finished transformer, and Sorgel usually purchased about $400,000 of each a year. The steel industry, which had gone through a 116 day strike in 1959, was bracing for another one when labor contracts ran out in May of 1965. In anticipation of a strike, Sorgel intended to have an eight months' supply of steel—two months' normal supply plus six months' supply to last out the strike—on hand by the contract deadline. In effect, this meant that Sorgel had to purchase its year's supply of steel within the first quarter of the year, or to put it in terms of money, it had to anticipate spending $300,000 more than usual soon after the first of the year.

Copper represented a more serious problem. While all transformers require copper wire, the size of the copper depends on the size of the transformer. Sorgel's transformers were built to customer as opposed to stock specifications, and until the orders were in Sorgel could not safely estimate how much of a single type of copper would be required for the year. Lack of a proper copper size meant production delay and/or costly redesigning in order to produce a transformer meeting specifications using the size of copper which might be available. Thus, Sorgel's copper needs required either carrying an inventory of many sizes, some of which might not be used for some time, or otherwise being able to count on quick delivery from its suppliers.

Beginning in 1964 copper production became critical. A copper supplier, who in 1963 could ship copper off the shelf, during the 1964–1966 period would need six to twelve weeks' delivery time. By 1964 copper producers, and in turn suppliers, were forced to ration. Between 1963 and mid 1965, copper prices in the major supplier market were up 20% despite a conscious effort to keep prices down. The outside or "gray" market saw a 200% rise over 1963 prices. In fact, some companies that were dependent on copper chose or were forced to go out of business because they could not compete based on the copper available to them.

Sorgel, not only being dependent on copper but also having a large backlog of orders for transformers at fixed prices, set out to buy as much copper as possible regardless of size. In 1965, copper in the amount of $904,524 was purchased, much of which was ordered in 1964. Nor was this adequate, for in 1965 Sorgel was still short of certain sizes.

I turn now to Sorgel's financial picture and operating expenses. At year's end in 1964, Sorgel had a net profit of $241,879. It had current assets of $1,513,492. The cash surrender and premium deposit value of life insurance policies held on the lives of William J. Sorgel and Fred Koeper and intended for stock redemption upon their death amounted to $201,125. Current liabilities were $496,998. The company's annual operating expenses were $3,419,348. A monthly analysis of the cash flow in 1964 indicates a peak deficit (i. e., incoming cash less outgoing cash) of $165,000 for any given month. Finally, the peak operating cycle (i. e., "Bardahl Formula," an attempt to measure how much company assets are involved in a cycle which begins with inventory purchase and ends with receipt of the customer's check) measured by 1964 performance was $865,095.

At the end of 1964, Sorgel Electric Company retained, as it had for several past years, all its earnings, declaring no dividend. I specifically find that for both the years 1964 and 1965, Sorgel Electric Company retained its earnings for use in its building program, inventory stockpiling, and normal working capital needs.

### Law

Title 26 U.S.C. § 531 imposes an accumulated income tax "for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532 * * *." Title 26 U.S.C. § 532 states that § 531 shall apply to every corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." While most § 531 cases revolve around the issue of whether the taxpayer is a § 532 company, such a discussion and decision are unnecessary to this case in that in the instant case, regardless of § 532, I find that Sorgel Electric Company failed to accumulate any § 535 "accumulated tax income" for either 1964 or 1965. Magic Mart, Inc. v. C.I.R., 51 T.C. 775 (1969).

Title 26 U.S.C. § 535 defines "accumulated taxable income" as meaning "taxable income * * * minus * * *

the accumulated earnings credit (as defined in subsection (c)).'' Subsection (c) states that the ''accumulated earnings credit is * * * an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * *.'' Title 26 U.S.C. § 537 defines '' 'reasonable needs of the business' '' as including ''the reasonably anticipated needs of the business.'' I find that Sorgel was entitled in 1964 and 1965 to a § 535(c) credit in an amount equal to the profits it retained in those years.

I have already found that Sorgel retained its 1964 and 1965 profits for use in its building program, for inventory stockpiling, and for its working capital needs. Three questions then remain: First, whether these three needs were in fact reasonably anticipated business needs; second, if so, then what amount was reasonably retained for that purpose; and third, whether it was reasonable in light of other available assets to retain the just earned profits.

There is no doubt that plant expansion, inventory, and working capital are business needs, and these needs were reasonably anticipated. The need to stockpile copper and steel was clearly perceived by Sorgel in 1964. Likewise, the clogged workshops indicate the reasonableness of an expansion program, and the planning activity in the last quarter of 1964 demonstrates that by December 31, 1964, there were ''specific, definite, and feasible plans'' to build a 260 foot building. Internal Revenue Regulation § 1.537(1) (b). The fact that Sorgel had not received formal approval from the city to close the alleyway did not make these specific and definite plans unfeasible. Indeed, the city's informal encouragement made the plan quite feasible. It was reasonable to accumulate $700,000 for the plant expansion. While no doubt Sorgel could have financed at least part of the expansion through debts, the decision not to, if possible, cannot be considered unreasonable. E. g., Mohawk Paper Mills, Inc. v. United States, 262 F.Supp. 365, 372 (E. D.N.Y.1966). Likewise, it was reasonable to set aside $800,000 for additional copper and steel inventory. Finally, I find that at the very least it was reasonable to retain *at a minimum* $300,000 for normal working capital in light of $496,998 of current liabilities, an operating cycle need of $865,000 in assets, and the general nature of the transformer business.[1]

The Government contends that Sorgel had $1,513,492 in current assets *plus* $201,125 in the cash and prepaid premium value of company-owned life insurance policies[2] available to meet its business needs. As I have already found that Sorgel had reasonable business needs of at least $1,800,000, it is unnecessary for me to decide this issue.

The Government concedes in both its post-trial proposed findings of law and brief ''that the Company did not retain its earnings and profits beyond its reasonable business needs for the year 1965.'' I have found that this is equally true with regard to 1964. Accordingly, in both years Sorgel Electric Company was without ''accumulated taxable in-

---

1. The plaintiffs have maintained that they should be allowed working capital equal to their ''Bardahl'' operating cycle of $865,000 plus current liabilities. The Government argues that no formula should be taken into account, but in any case that the Bardahl cycle should not be added to the current liabilities. See Schenuit Rubber Co. v. United States, 293 F.Supp. 280 (Md.1968). The Government further suggests as possible standards (1) a ''monthly expense requirement,'' i. e., one-twelfth the annual operating expenses plus current liabilities, and (2) a ''monthly cash flow,'' i. e., the month when cash outflow exceeds cash inflow by the greatest amount plus current liabilities. The Government formulas then all suggest that a working capital retention of $700,000 to $800,000 would be reasonable.

2. The Government contends that the life insurance was not a business need of Sorgel and, therefore, that its cash value must be considered available to meet any true business needs.

come," and, therefore, the § 531 assessment for those years was improper.[3]

## DEMOLITION AND AMORTIZATION EXPENSES
### Facts

Beginning in 1963, Sorgel began to purchase a number of properties surrounding or on the same block as its main plant. In November of 1963, the corporation purchased Tract B, a lot containing two rather dilapidated residential buildings. Tract B was situated directly behind the Sorgel plant but across an alleyway (the same alley discussed in the § 531 case). The purchase was made with the intention of tearing down the residence structures at some future time to make way for a plant addition. The purchase price was $25,400, of which Sorgel allocated $21,990 to the residences. At the time of purchase, the residences commanded monthly rentals of $380. Subsequent to purchase, the city health department ordered repairs, and the buildings were also vandalized. Sorgel determined that it might as well demolish the structures, and this was done in August of 1965. Prior to construction of a plant addition in 1970, the lot was used as a parking lot.

In November of 1963, Tract D, a lot containing two dilapidated residences, was also purchased for the purpose of future expansion. Tract D was directly behind Tract B. The buildings were torn down in August of 1965. Plaintiffs now concede that defendant's determinations with regard to Tract D were correct.

In August of 1964, Sorgel purchased Tract E, a lot containing a grocery store building. This lot is directly behind Tract B and aside Tract D. The purchase price was $7,500, of which $4,700 was allocated to the building. Plaintiffs intended to use the store for storage until such time as plant expansion required using the lot. However, within twenty-four hours after purchase, the building was vandalized, and in September of 1964 Sorgel demolished it. In 1967 a plant addition was built on Tract E (and Tract D).

In 1963, 1964, and 1965, Sorgel took a depreciation deduction on the buildings on Tracts B and D. In 1965 the corporation took a deduction for demolition loss, i. e., the undepreciated balance for the building on these two tracts, and for demolition costs. In 1964 Sorgel took a demolition loss and cost deduction with regard to the buildings on Tract E.

In November of 1963 Sorgel purchased Tract C, a lot containing two residences in bad condition. Tract C was directly adjacent to Tracts B and D. The plant addition discussed supra with regard to the § 531 case was built on this tract (and on Tract F) in 1965. The purchase price was $22,600, of which $18,660 was allocated to the build-

---

3. The Government has also argued that because Sorgel had in years previous to 1964 retained upwards of a quarter of a million dollars in life insurance policies (which the Government contends are not a proper business need), the quarter of a million dollar profit in 1964 is subject to a § 531 assessment. The argument is *non sequitur*, as the § 531 assessment falls only on the profits of the tax year in question. It is not, as the Government's argument suggests, a broad attempt to tax profits (or capital) accumulated in years other than the ones at issue. E. g., Mertens, Law of Federal Income Taxation, Vol. 7, § 39.32.

I would add to avoid misunderstanding that I suggest no disagreement with the general rule that in determining whether the profits for the years in question were reasonably retained it is necessary to determine what prior accumulated assets were available to meet business needs. Nor do I mean to suggest that prior accumulations earmarked for nonbusiness needs might not be considered available to meet legitimate business needs. And I do not suggest that past accumulations for nonbusiness purposes cannot be evidence of the fact that current profits are similarly being retained. What I specifically reject is only the Government's suggestion that when current profits plus prior accumulations fail to meet future business needs, a § 535 credit will still not attach simply because some of the prior accumulations were for unnessary business needs.

ings. The lot was purchased for the purpose of eventual plant expansion. The two buildings at the time of purchase commanded monthly rentals of $230. The buildings were torn down in January of 1965 to make way for the new plant addition.

In late October of 1964 the corporation purchased Tract F with the intention of immediately tearing down a bowling alley on it to make way for a new plant addition. The lot was adjacent to the Sorgel plant and directly in front of part of Tracts B and C, except that an alley (discussed supra) separated Tract F from Tracts B and C. The purchase price was $45,095.10, of which $35,095.10 was allocated to the existing building. In January of 1965, the bowling alley was torn down to make way for the new plant addition discussed in the § 531 case.

In 1963 and 1964 Sorgel took a depreciation deduction on the buildings on Tract C. In 1964 one was also taken on the building on Tract F. On March 31, 1965, Sorgel conveyed Tracts C and F to Industrial Enterprises, Inc., in order that Industrial might erect a plant addition which would then be leased back to Sorgel. Industrial Enterprises was wholly owned by Fred Koeper and William J. Sorgel and was established solely to provide certain business benefits to Sorgel Electric Company. Sorgel Electric Company charged the undepreciated balance on the building on Tracts C and F to a leasehold improvement account as a capital expenditure allocated to the new building leased from Industrial Enterprises. Pursuant to a ten-year amortization of that amount, it then claimed a deduction on its 1965 tax return.

With regard to Tract F, the defendant disallowed the depreciation deduction. Plaintiffs now concede the propriety of this disallowance. With regard to Tracts B, D, and E, defendant disallowed the demolition loss and cost deductions. Plaintiffs concede that with regard to Tract D, the disallowance was proper but contests the disallowance with regard to Tracts B and E. With regard to Tracts C and F, defendants disallowed the leasehold amortization deductions. Plaintiffs contest this disallowance.

### Law

Plaintiffs assert that with regard to Tracts B and E, the law is governed by Internal Revenue Regulation § 1.165–3. That section provides in relevant part that "(1) Except as provided in subparagraph (2) * * *: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings * * *" when "real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: * * *. The entire basis of the property so purchased shall * * * be allocated to the land only." Subparagraph (2) reads: "(i) If the property is purchased with the intention of demolishing the buildings and the buildings are used in a trade or business or held for the production of income before their demolition, a portion of the basis of the property may be allocated to such buildings * * *. * * * (ii) * * * any portion of the basis of the buildings which has not been recovered through depreciation or otherwise at the time of the demolition of the buildings is allowable as a deduction under section 165."

With regard to Tracts C and F, plaintiffs assert that the law of the case is governed by Internal Revenue Regulations §§ 1.162–11(b) and 1.167(a)–4. The relevant part of § 1.162–11(b) (1) provides that "The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. * * *" The relevant part of § 1.167(a)–4 provides that "Capital expenditures made by a lessee for the erection of buildings or the construction of other permanent improvements on leased property are recoverable through allowances for depreciation or amortization. * * *"

As regards Tracts B and E, plaintiffs in their post-trial brief argue:

"Although the record is clear that the said properties were acquired with the intention to ultimately demolish them, the record is also clear that the buildings * * * would not have been demolished until 1970 [and 1967] * * * but for the City's enforcement of Health Code violations and vandalism, * * *. The Company could not have deducted any such demolition loss or costs in 1970 and 1967, respectively, but it is submitted that they could claim a deduction in 1965 and 1964, respectively, due to the subsequent events causing a premature loss of the value of the buildings involved and a premature expense as to their demolition." (P. 65)

It is clear then that plaintiffs contest the defendant's disallowance on the basis of § 1.165-3(a) (2). It is unnecessary for me to decide, however, whether this section is applicable to the instant case. Even assuming § 1.165-3(a) (2) is applicable and that some allotment under that regulation should have been made for the buildings, the plaintiffs have completely failed to provide a suitable record which would allow the court to make such a determination and allotment. Accordingly, plaintiffs' position cannot be sustained.

As regards Tracts C and F, plaintiffs argue in their post-trial brief that:

"The buildings involved were demolished by the Company to make way for the leased building and thus, it is submitted, are properly viewable as a capital improvement of its leasehold interest in such building." (P. 65)

Noting that the capital expenditures claimed were made before transfer of the land to Industrial Enterprises, Inc., the short answer to plaintiffs' position is simply that there was no capital expenditure to amortize in that that expenditure was fully recompensed by the sale price paid to Sorgel by Industrial. Or to put it another way, plaintiffs fail in their attempt to capitalize on a legal fiction, i. e., the lease back, because they overlook the initial fiction, i. e., the sale.

In sum then, I find that the tax assessment against plaintiffs was correct except for the assessment of the § 531 tax for the years 1964 and 1965.

The parties have stipulated that the refund to plaintiffs will be computed by the parties on the basis of the court's findings, and a judgment will be submitted on that basis.