VULCAN STEAM FORGING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vulcan Steam Forging Co. v. Commissioner
Docket Nos. 974-73, 3149-74.
United States Tax Court
T.C. Memo 1976-29; 1976 Tax Ct. Memo LEXIS 375; 35 T.C.M. (CCH) 110; T.C.M. (RIA) 760029; February 3, 1976, Filed Albert R. Mugel and Samuel J. Palisano, for the petitioner. George W. Connelly, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In these consolidated cases, respondent has determined the following deficiencies in petitioner's Federal income tax: Docket No.
Taxable Year
Deficiency
974-73
1966
$ 12,980.18
1967
25,222.82
1968
2,265.56
3149-74
1970
17,615.61 The only issue before us is whether petitioner was availed of for the purpose of avoiding Federal income taxes with respect to its shareholders within the meaning of section 532(a), [1] so that it is liable for accumulated earnings taxes on its undistributed earnings. FINDINGS OF FACT The stipulation of facts filed by the parties and the exhibits attached thereto are incorporated *377 herein by this reference. Petitioner, Vulcan Steam Forging Company, Inc. (hereinafter referred to as "Vulcan" or "petitioner"), is a New York corporation organized in 1907. At all relevant times, Vulcan's principal place of business was, and continues to be, 247 Rano Street, Buffalo, New York. Vulcan is an accrual basis, calendar year taxpayer; it timely filed its Federal income tax returns for each of the years in question with the district director of internal revenue, Buffalo, New York. Between 1942 and 1954, Leo M. Duggan, Sr. (hereinafter "Leo") acquired all 400 outstanding shares of petitioner. Leo remained Vulcan's sole shareholder until December 15, 1964, at which time he transferred 50 shares to his son Leo M. Duggan, Jr. (hereinafter "Matt"). On December 20, 1965, Leo transferred an additional 90 shares of Vulcan to Matt. For each of these transfers, Leo filed a Federal gift tax return in which he reported the value of the gifted stock at $ 500 per share. Upon audit of such returns, respondent adjusted the value of Vulcan stock to $ 750 per share, resulting in gift tax deficiencies, which were then assessed and paid. For all of the years in question, Leo, Matt, and *378 Leo's wife, Alice, served as petitioner's directors. Officerships were as follows: Year
Office
Name
1966
President, Treasurer
Leo
Vice President
Alice
Secretary
Matt
1967-1968
President, Treasurer
Leo
Vice President
Matt
Secretary
Alice
1970
President
Matt
Treasurer
Leo
Secretary
Alice
Leo's health had been failing for some time prior to 1968 and it was in his interest as well as that of Vulcan that he retire from active participation in the business. On December 20, 1968, he resigned as president and general manager and Vulcan repurchased all of his remaining stock, 260 shares, at a price of $ 78,000, or $ 300 per share. The repurchase price was not a negotiated figure; it was unilaterally determined by Leo, who calculated the amount he would need for living expenses in light of Vulcan's financial position. Thereafter, Leo rendered occasional advisory services to Vulcan until his death on October 12, 1973. Leo and Matt received the following compensation [2] from petitioner from 1966 through 1970: Compensation
Compensation
Year
to Leo
to Matt
1966
$ 25,900
$ 22,700
1967
29,004
25,700
1968
23,400
29,200
1969
1,800
42,900
[1] 1970 1,500
42,575
*379 Corporate records show no history of dividend distribution by Vulcan. Vulcan's business is the forging of metal bars, rings, discs, shafts, and other metal shapes. It has no product line and only produces metal items to specification upon customer order. The forging process involves the heating of metal billets, purchased from metal manufacturers or suppliers, to the point of required malleability, hammering the heated substance into the desired form, and heat-treating the product for strength. Petitioner's customers are manufacturers of machinery and equipment who use the forgings for such components as cylinders or pistons in power plants, ships, submarines, and various industrial equipment. Vulcan has acquired a reputation for its quality output as *380 well as its accomodating service. [3]
During the taxable years under scrutiny, petitioner operated three steamdriven, flat, open-die forge hammers at its premises. The largest of these hammers, rated at 2,000 pounds, was not capable of meeting orders for larger and heavier forgings, the demand for which had increased appreciably during the post-World War II era. In 1959, Vulcan made an effort to meet this new demand; it installed a drop hammer rated at 8,000 pounds and erected a new structure to house such hammer. This effort proved unsuccessful. Petitioner had failed to secure a building permit prior to making the new installation. When subsequently applying for such permit, Vulcan learned that approval of the Zoning Board of Appeals was required since the installation resulted in an extension of a non-conforming use under the Buffalo zoning ordinance. [4] After petitioning the appropriate authority, hearings were held on Vulcan's application. Neighborhood residents appeared in opposition to the approval of the new structure. [5]The Zoning Board ultimately approved the structure upon the condition *381 that no drop or power hammer be used therein. The large hammer has remained idle since the decision of the Zoning Board. Vulcan has had to meet its customers' demands by working its smaller hammers in excess of their recommended capacities, by farming out its orders for larger forgings to other shops (often competitors), and by encouraging its customers to "break-up" their orders and have Vulcan fill their needs for small forgings only. In the early 1960's, petitioner explored the possibility of converting from the use of hammers to the use of a hydraulic press in the forging process. The press might have reduced noise and vibration problems that were generated by the use of the large hammer and *382 resulted in the Zoning Board's prohibition of the hammer's operation. After receiving an estimate of the cost of a press installation, conversion plans were abandoned no later than 1964. Minutes from petitioner's annual meeting of shareholders and directors in February, 1965, reflect an authorization of Leo, as president, to explore the possibility of acquiring a new plant site free from zoning restrictions. Within the year following such meeting, Leo spoke with William Gunn, expressing petitioner's desire to expand and relocate. Gunn, who had dealt with Vulcan on behalf of various metal suppliers, was also involved in real estate. Thereafter, on occasion, Gunn showed Leo and Matt some prospective sites but never showed Vulcan's property to any prospective buyers. Gunn was never told the price range within which Vulcan was willing to spend in relocating. Leo and Matt rejected the sites shown to them by Gunn. Matt had also spoken of the possibility of moving with another realtor, Saperston, who then began mailing to Vulcan "flyers" announcing available industrial properties in the Buffalo area. To date, Vulcan remains at the same address. In 1967, petitioner requested from Balling *383 Construction, Inc., a cost estimate for the construction of a new plant. Based upon rudimentary sketches, $ 450,000 was quoted as a rough estimate for the plant, exclusive of land and moving expenses. This estimate has never been updated. Upon receipt of the estimate, Matt asked Mr. Balling to keep an eye open for potential relocation sites. In 1968, Vulcan employees switched their union affiliation from the International Brotherhood of Firemen and Oilers to the International Union of District 50, United Mine Workers of America. Collective bargaining with the new union agent failed to result in an agreement prior to the October 23, 1968 expiration of the existing contract with the old union. In fact, it was not until May of 1969 that an agreement was finally concluded. Prior to the execution of the new contract, labor had threatened to strike petitioner. No work stoppages occurred. In 1966 and 1967, Sealol, Inc., was a substantial customer of Vulcan. In November, 1967, a proposed merger of Sealol into another corporation was announced. This merger was not consummated, but in August, 1968, Sealol was acquired by, and thereafter was operated as a subsidiary of, E.G. & G., Inc. *384 Vulcan's key salesman, Mr. Labarge, who was also responsible for maintaining the Sealol business, became ill in 1967 and died in the spring of 1968. Sealol has remained a substantial customer of Vulcan. Vulcan's income and accumulations of earnings and profits were as follows: 1966
1967
1968
1970
Total Income
$ 1,154,096.02
$ 1,217,726.44
$ 830,689.50
$ 1,022,626.91
Gross Profit
520,090.61
623,562.75
456,210.63
601,664.29
Pre-Tax Net Profit
74,269.16
161,066.75
3,278.72
109,446.57
Fed. Income Taxes
29,149.20
70,812.04
1,346.24
47,185.22
After-Tax Profit
45,119.96
90,254.71
1,932.48
62,261.35
Retained Earnings
from Prior Years
531,287.26
576,449,84
705,844.64
575,420.08
Retained Earnings
at End of Year
576,449.84
705,844.64
[1] 577,627.68 669,992.64
On its financial statements, petitioner showed income and profit or loss as follows for 1971 through 1973: Year
Total income
Net profit (or loss)
1971
$ 893,608.58
[30,566.77)
1972
977,954.92
(21,627.39)
1973
1,190,568.02
15,526.72
*385 Petitioner's working capital and its working capital needs under the so-called Bardahl formula [6] are as follows: 12/31/66
12/31/67
12/31/68
12/31/70
Working
capital
$ 366,662.00
$ 443,523.00
$ 367,967.00
$ 468,484.00
Working
capital
needs
254,104.00
262,879.00
295,257.00
274,811.00
Difference
$ 112,558.00
$ 180,644.00
$ 72,710.00
$ 193,673.00
Less: Purchase
of capital
assets
5,976.00
34,122.00
4,469.00
7,061.00
Excess
working
capital
$ 106,582.00
$ 146,522.00
$ 68,241.00
$ 186,612.00
Sec. 531
penalty
asserted
for years
1966, 1967,
and 1968
[7] $ 41,430.74 *386 The analysis of petitioner's current assets, quick assets, and current liabilities at the end of each taxable year and the attendant ratios is as follows: 1966
1967
1968
1970
Current assets
$ 442,652
$ 580,158
$ 389,554
$ 552,437
Current liabilities
46,841
65,823
20,241
[1] 46,818 Quick assets
(current assets
less receivables
and inventories
218,230
302,023
247,008
404,369
Current-asset to
current-liability
9.4 / 1
8.9 / 1
19.2 / 1
11.8 / 1
ratio
Quick-asset to
current-liability
ratio
4.7 / 1
4.6 / 1
12.2 / 1
8.6 / 1 If Vulcan had distributed rather than retained its earnings for the years in question, the additional income tax liabilities of the recipient shareholders would have been: 1966
1967
1968
1970
Leo
$ 11,226.27
$ 24,158.72
0
0
Matt
5,004.25
10,654.46
$ 1,133.53
$ 26,874.36
On July 1, 1967, Vulcan *387 loaned Matt $ 34,375.00, which Matt used to purchase a home. Before petitioner advanced the money to Matt, Leo consulted Vulcan's accountant on the advisability of such loan. The accountant advised petitioner to go ahead with the loan, since "the money [for repayment] was readily available any time." The loan was made interest-free. The transaction was not embodied in a written instrument and the accountant told Matt he could repay the money at any time. An additional $ 1,500 loan was extended to Matt in November, 1970, on the same terms as the prior loan. Matt repaid parts of the debt by direct cash payments; the balance was repaid with cash bonuses awarded Matt by petitioner which were withheld and charged against the loan. The repayments were as follows: Date
Direct payment
Bonus withheld
12/67
$ 3,000
4/68
$ 1,000
8/68
2,500
12/68
500
12/68
6,000
4/69
2,000
6/69
200
8/69
5,000
12/69
5,000
1/70
1,500
12/70
5,175
12/71
4,000
Petitioner's board of directors never authorized these loans to Matt, nor did the Board authorize the bonuses awarded to Matt. Between 1966 and 1970, petitioner loaned amounts ranging from $ 100 to $ *388 3,680 to various employees who were not officers. Vulcan treated these amounts as salary advances and charged them off against the respective employees' salaries as they accrued. During all of the years in question, Vulcan maintained insurance policies on the lives of Leo and Matt. Vulcan was the sole beneficiary of these policies. It continued to pay premiums on the policy covering Leo's life even after Leo's 1968 withdrawal from the active management of the business. Total expenditures for insurance ranged from approximately $ 540 in 1966 to $ 7,687 in 1970. Other expenditures of earnings between 1966 and 1970 are accounted for in purchases of machinery and equipment in the following amounts: 1966
$ 6,146.86
1967
34,122.47
[1]
1968
3,851.23
1970
5,449.07
ULTIMATE FINDING OF FACT Petitioner was a corporation not availed of for the purpose of avoiding Federal income taxes with respect to its shareholders during each of the taxable years 1966, 1967, and 1968 but was so availed of during the taxable year 1970. OPINION *389 The determination as to whether petitioner was "availed of for the purpose of avoiding the income tax with respect to its shareholders" (section 532(a)) involves two basic questions: (1) did petitioner permit its earnings and profits to accumulate beyond "the reasonable needs of the business" (sections 533(a) and 537), and (2) did petitioner have the proscribed purpose? [8] Both questions are issues of fact. See Bremerton Sun Publishing Co.,44 T.C. 566, 582 (1965). Each is distinct in the sense that "an answer to the first question, which is unfavorable to petitioner, is not determinative of the second question" (see Alex Brown, Inc.,60 T.C. 364, 366 (1973), affd. per curiam, 496 F. 2d 621 (6th Cir. 1974)), but they are sometimes related in the sense that the presence or absence of an intention to provide for the reasonable needs of the business during the taxable years at issue may be involved both in determining whether the statutory requirement as to those needs has been met and also in ascertaining the existence of the proscribed purpose. Indeed, this intertwining is an important element in the instant case. *390 Petitioner's case rests upon its assertion that during the taxable years at issue: (1) it was faced with the need to relocate its business; (2) the costs involved in satisfying that need exceeded its accumulated earnings and profits (or at least the amount of assets considered as available for such purpose (see Faber Cement Block Co.,50 T.C. 317 (1968)); (3) that it had a bona fide intent to accomplish the relocation; and (4) that it was prevented from doing so only because of the lack of sufficient funds. Respondent concedes that the need to relocate existed and in effect admits that the cost thereof would satisfy the requirement that the accumulations be for the reasonable needs of the business. Respondent also admits that petitioner "perceived the problem and hoped to solve it by relocating" (respondent's reply brief, p. 8) (emphasis added), but contends that petitioner did not, during the taxable years at issue, have the requisite intent to accomplish its purpose. Thus do the parties lock horns and it is to the issue of intent that we turn our attention. Clearly *391 the demand of the statute is not met merely by proof that a need for accumulation exists. The need must be coupled with a determination on the part of the taxpayer to meet that need, i.e., a bona fide intent. See Oklahoma Press Publishing Company v. United States,437 F. 2d 1275, 1280 (10th Cir. 1971) ("There was an imperative need to replace the old printing press and the intention that it would be done in the regular course of business"); Sterling Distributors, Inc. v. United States,313 F. 2d 803, 807 (5th Cir. 1963) ("There was a need for a new and larger warehouse * * * and an intention that the need would be met"). See also Mohawk Paper Mills, Inc. v. United States,262 F. Supp. 365, 371-372 (N.D.N.Y. 1966); Faber Cement Block Co.,supra,50 T.C. at 332. The facts show that by the first taxable year involved herein, i.e., 1966, petitioner had abandoned its efforts to solve its problem by the use of a hydraulic press at its existing location and had decided to relocate. Thus in February, 1965, the board of directors authorized the search for a new site. Petitioner sought the services of a real estate agent and, at least *392 during the taxable years 1966, 1967, and 1968, examined possible alternative locations. In September, 1967, petitioner obtained an estimate of the cost of building a new plant. To be sure, these indicia were not as specific as they might have been and, if we were in the position of having to decide whether a need existed, we might well consider that the requirements of respondent's regulations that there be "specific, definite, and feasible plans for the use of such accumulation" ( section 1.537-1(b), Income Tax Regs.) had not been met. But, in the context of resolving the question as to whether the petitioner had the requisite intent to meet the conceded need, we think they were sufficient during the taxable years 1966 through 1968. [9]
*393 Other factors were present during those years which bear upon the issue of bona fide intent. Thus, in 1967, there was the prospect of a change of ownership of Sealol, one of petitioner's principal customers and, in 1968, that change of ownership in fact occurred. Given petitioner's continuing problem of being unable to manufacture the larger-size forgings needed by its customers and the various techniques which petitioner utilized to minimize the difficulties inherent in the situation, the potential change in the ownership of Sealol was clearly a matter of concern. This concern was further aggravated by the illness of petitioner's salesman, Labarge, who was responsible for the Sealol account -- an illness which began in 1967 and culminated in Labarge's death in 1968. Additional disrupting factors are reflected in the health problems of Leo, which brought about his retirement in 1968 from active participation in the business, and in the potentiality of labor difficulties in 1968. We cite the foregoing factors not as evidence of needs of the business, independent of the need to relocate, but as evidence of problems which occupied the time and attention of the executive personnel of *394 petitioner and serve as an explanation of why the search for a new plant site was not as vigorously pursued as it otherwise might have been during the years 1966 through 1968 -- evidence which we think has a bearing on the question of petitioner's bona fide intent. See Simons-Eastern Company v. United States,354 F. Supp. 1003, 1011 (N.D. Ga. 1972). Contrast Alex Brown, Inc.,supra.
We attach little significance to the loans to Matt in 1967 and 1970, to the purchase of Leo's stock at the time of his retirement from the business in 1968, or to the payment of premiums on the life of each 6f the Duggans. With respect to the loans to Matt, they were isolated transactions, small in amount (compare Young Motor Company v. Commissioner,339 F. 2d 481 (1st Cir. 1964), affg. T.C. Memo. 1964-22), particularly in relation to the costs of relocation; they were repaid over a period of approximately four years; and they could have been repaid by Matt through mortgage financing at any time. In this frame of reference, the loans should at most be considered as the equivalent of a liquid asset available to meet the relocation need. *395 See F. E. Watkins Motor Co.,31 T.C. 288, 301 (1958). The purchase of Leo's stock was impregnated with reasons relating to his illness, age, and the importance of vesting Matt with authority, commensurate with his responsibility, to run the business. See Mountain State Steel Foundries,Inc. v. Commissioner,284 F. 2d 737, 745 (4th Cir. 1960), revg. on other grounds T.C. Memo. 1959-59, and Farmers and Merchants Investment Co.,T.C. Memo. 1970-161. As to the premiums on life insurance for Matt, that insurance served an ostensible business purpose. The policies held on Leo's life were also justifiable, at least through the time when he retired. Both Duggans could be properly characterized as "key" men. After Leo's retirement, given his age and health, maintaining the insurance would appear to have been an inexpensive way of protecting a previous investment. If the foregoing factors have any significance, it is at most peripheral. We think the taxable year 1970 presents a different picture. To be sure, the need to relocate remained, but evidence as to action to meet that need during 1970 is practically nonexistent. *396 All of the special problems which beset the business in the earlier years had been resolved, with the exception of the lack of capacity to make the larger forgings. But that exception standing alone is insufficient. Petitioner had lived with the situation for almost twenty years and there is every indication in the record that it was capable of continuing to do so. To be sure, petitioner had operated at a very small profit in 1968 and 1969 and, as it turns out, operated at a loss in 1971 and 1972. But there is not the slightest explanation in the record as to the cause of these depressed earnings or their relationship to the need to accumulate earnings and profits in 1970. We think that, by 1970, petitioner had decided to stay where it was indefinitely (see Oklahoma Press Publishing Company v. United States,supra,437 F. 2d at 1279)) and no longer was giving "real consideration" to meeting the need to relocate and that consequently the requisite intent was lacking. See Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495, 499 (4th Cir. 1960), affg. T.C. Memo. 1958-221. Much of what we have said about the existence of a bona *397 fide intent to meet petitioner's need to relocate is applicable to the determination of the proscribed purpose under section 532(a). To the extent that such intent did not exist, it is indicative of a purpose to avoid income tax. Perhaps there may, on occasion, be subtle nuances between a taxpayer's intent to meet its business need and a taxpayer's purpose in accumulating earnings and profits. But, in the instant case, we think such intent and purpose emerge intertwined from the evidentiary mosaic before us. In sum, we conclude that petitioner herein had the requisite intent to meet its need to relocate and was not availed of for the proscribed purpose during the taxable years 1966, 1967, and 1968 but did not have such intent and was availed of for the proscribed purpose during the taxable year 1970. We reach this conclusion affirmatively on the basis of the preponderance of the evidence contained in the record as a whole (as distinguished from failure of proof), including our evaluation of the testimony of the witnesses whom we saw and heard and irrespective of the location of the burden of proof. In this context, we find it unnecessary to determine whether petitioner's section *398 534 statements were sufficient to shift to respondent the burden of proof as to the reasonable needs of the business under section 534(a). Our conclusion also takes into account the mandate of United States v. Donruss Co.,393 U.S. 297 (1969), that tax avoidance may not be one of the purposes for accumulation and reflects the fact that there is evidence that the Duggans had knowledge of the increased taxes which they would have been required to pay if petitioner had declared dividends to the extent of its earnings and profits during the years in issue. As the Supreme Court stated in United States v. Donruss Co.,supra,393 U.S. at 309-- "purpose" means more than mere knowledge, undoubtedly present in every case. It is still open to the taxpayer to show that even though knowledge of the tax consequences was present, that knowledge did not contribute to the decision to accumulate earnings. This petitioner has succeeded in doing to the extent that our conclusion *399 indicates. Decision will be entered for the petitioner in docket No. 974-73.
Decision will be entered for the respondent in docket No. 3149-74.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise stated.↩
2. Compensation includes salaries, bonuses, drawing accounts, and, in the case of Leo after 1968, advisory fees.↩
1. Not reflected in the above chart is a $ 2,000 interest-free loan made by Vulcan to Leo on September 1, 1970. The loan was not authorized by Vulcan's board of directors, it was not committed to writing, and it had no set repayment schedule. On December 31, 1971, Vulcan wrote off the loan as "officer's salary." ↩
3. Vulcan built up much goodwill by extending liberal credit to its customers.↩
4. The Rano Street area was zoned "light-industrial" after Vulcan had come into existence. Its operations constituted a nonconforming use. ↩
5. The neighborhood in which Vulcan was situated was largely residential. Area residents complained of aggravating noise and vibration occasioned by the use of Vulcan's 8,000-pound hammer, resulting in damage to neighbors' homes and nervous systems. All told, the large hammer was in use a total of approximately three days before it was retired.↩
1. The drop in retained earnings for 1968 is due, in large part, to the petitioner's repurchase of the shares held by Leo for $ 78,000. See p. 4, supra.↩
6. See Bardahl Manufacturing Corp.,T.C. Memo. 1965-200. The parties have stipulated the Bardahl↩ calculations. 7. Respondent concedes an awareness by the end of 1970 of petitioner's potential liability for an accumulated earnings tax for 1966, 1967, and 1968 because the respondent had previously issued his District Conference report but contends that petitioner took no steps accounting-wise to recognize this potential liability. It would appear that respondent has taken too narrow a view of the qualification of this potential liability as a reasonable need of the business, but, in the context of this case, we can assume without deciding that it did so qualify.↩
1. The 1970 balance sheet for petitioner, submitted as a joint exhibit, puts this figure at $ 46,818.00. Respondent's brief carries this item at $ 46,813.00. We have no explanation of this discrepancy. Therefore, we will assume the balance sheet figure is the correct one.↩
1. The bulk of this sum is attributable to the purchase of a boiler.↩
8. On the face of section 532(a), a taxpayer could be subject to the accumulated earnings tax if it had the proscribed purpose, even though the retention of its earnings and profits was justified by the reasonable needs of the business. But this result is effectively precluded since 1954 by the accumulated earnings credit under section 535(c)↩.
9. Given this frame of reference, we find it unnecessary to discuss in detail petitioner's argument that respondent's regulations apply only where the issue relates to the reasonableness of a future anticipated need and not to a proven existing need, although we are constrained to observe that we think such a distinction is unwarranted and has, at least by implication, been rejected in the decided cases. See Magic Mart, Inc.,51 T.C. 775, 797 (1969); Faber Cement Block Co.,50 T.C. 317, 331-333 (1968). See also Dixie, Inc. v. Commissioner,277 F. 2d 526, 528 (2d Cir., 1960), affg. 31 T.C. 415↩ (1958).