**HENRY VAN HUMMELL, INC.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 8104.

United States Court of Appeals
Tenth Circuit.

Aug. 15, 1966.

Rehearing Denied Sept. 12, 1966.

Morrison Shafroth, Denver, Colo. (Grant, Shafroth, Toll & McHendrie, John N. Dahle, and James H. Skinner, Jr., Denver, Colo., on the brief), for petitioner.

Robert A. Bernstein, Atty., Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before LEWIS, BREITENSTEIN and SETH, Circuit Judges.

SETH, Circuit Judge.

This is a petition for review of a decision of the Tax Court (23 T.C.M. 1765) which upheld the Commissioner's determination that petitioner was subject to the accumulated earnings tax imposed under Section 531 of the 1954 Internal Revenue Code. The Tax Court concluded that the petitioner accumulated profits in excess of the needs of the business, and that the accumulation was to avoid taxes. The deficiencies found were for the years 1956, 1957, 1958, and 1959, and total $147,204.60. The petitioner moved the Tax Court for a new trial and for reconsideration, but the motion was denied.

On this appeal the petitioner asserts that the findings of the Tax Court on the critical issues are in error, and not supported by the evidence. Taxpayer corporation urges generally that its business needed the accumulations to meet the hazards and the uncertainties of its business.

The petitioner is a closely held corporation engaged in the sale by mail and the servicing of annual renewable group life insurance to some 75,000 to 80,000 members of the Federal Postal Employees Association. The petitioner collected the premiums from the members and remitted them to the insurance company which had written the group life insurance policy. The petitioner entered into a contract with the Federal Postal Employees Association in 1928 and extended in 1936 for a term of fifty years, which gave it the exclusive right to handle the annual renewal term insurance for its members, to recruit membership, and to publish its magazine. The petitioner has some eighty employees, a building, and the necessary machinery to handle the very large volume of correspondence with the membership of the Association.

The petitioner's income is derived, under its contract with the Association, primarily from the mortality refund which accrues under the insuring agreement between the Association and the insurance carrier. This refund is the difference between the total group insurance premiums and the total of all insurance claims, commissions, and a percentage charge paid to the insurance carrier. The Association initially receives this refund annually and remits it to the petitioner. If the death claims in any year should exceed the

premium totals the insurance carrier reserves the right to deduct such excess from future mortality refunds. The petitioner also receives by way of income the dues from the Association members, some insurance commissions on the Association insurance, interest on investments, and some rents. For the years in issue the mortality refund constitutes about seventy per cent of petitioner's income, and without it the corporation would have operated at a deficit.

The Tax Court found for the years in issue (1956, 1957, 1958, and 1959) the actual ordinary cash operating expenses of petitioner ranged from $647,170 to $832,633 with an additional extraordinary amount in one year of $180,000. The Tax Court also found that as of the end of 1956 the corporation had accumulated net liquid assets (net current assets plus investments not integral to business) available for business needs in an amount of $1,189,476, and at the end of 1959 this figure was $1,536,056, or an increase of $491,706. During this period dividends were paid ranging from 41.80 per cent of net income to 62.35 per cent of net income, and there were also substantial salaries paid to stockholder officers.

As indicated above, the corporation was closely held as members of one family owned some 95 per cent of its stock. The Government witness computed the total family tax savings resulting from the retention of earnings claimed to be excessive was $309,000. The corporate investments were primarily in Government bonds and in unrelated stocks. In 1958 and 1959 substantial investments were made in Willows Realty Company. Also the company office building was sold to it in exchange for stock. The Willows Company was owned primarily by the same family.

The Internal Revenue Code of 1954 provides for the imposition of an accumulated earnings tax upon corporations availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed (Sections 531, 532.) The next following Section of the Code provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary" (Section 533).

■■ The initial determination under the statute is one of fact—whether the accumulation is beyond the reasonable needs of the business. The reasonableness of the needs is necessarily for determination by those concerned with the management of the particular enterprise. This determination must prevail unless the facts show clearly the accumulations were for prohibited purposes. The Tax Court expressed this doctrine in its opinion, examined the purposes advanced by the petitioner for the accumulations, and found that they were nevertheless beyond the reasonable needs of the corporation. This finding is, of course, one of fact made by the court, and if supported by the record it must stand. World Publishing Co. v. United States, 169 F.2d 186 (10th Cir.); KOMA, Inc. v. Com'r of Internal Revenue, 189 F.2d 390 (10th Cir.).

■ The record shows that the reasonable needs of the business fell considerably below the amount accumulated. As indicated above, the Tax Court's calculation of actual cash operating expenses for each year involved ranged from $647,170 in 1956 to $832,633 in 1959. The net liquid assets available increased this same period from $1,189,476 in 1956 to $1,536,056 in 1959. On this issue the petitioner introduced evidence as to the hazards and uncertainties of the business in which it was engaged. The individuality of each business must be considered on this issue in order to ascertain what is reasonable. All the facts and circumstances must be evaluated with proper consideration given to each and to all. World Publishing Co. v. United States, 169 F.2d 186 (10th Cir.).

The petitioner points out that fluctuations in the mortality rates of the Postal Employees Association members directly affect its income, but the record shows but slight fluctuations in this mortality rate during the prior twenty years of petitioner's experience. The ratio of death claims to total insurance in fact ranged from .818 per cent to 1.114 per cent. The record shows that for the years in question the mortality rate would have had to increase some 23 per cent before a deficit would result. It was also pointed out that unfavorable legislation had been passed in some states, and that increased competition was faced. The most serious competition pointed out was the federal government group insurance started in 1954. However the insurance in force with Association members nevertheless continued to increase after 1954 and prior to the period in question. The changes in the general competitive position of petitioner were shown, and this was considered by the Tax Court.

The petitioner also urges that the Association was becoming dissatisfied with its contract with the petitioner, and the individual members were also unhappy with the arrangement. This, it urges, created a serious hazard to the business as it was dependent on this arrangement. The record however does not show that the management took action to meet these conditions during the period in question as nothing appears in the corporate records to show that any provision was made for such a problem. Subsequent events did show that the contract with the Association had become a matter of contention because it was in 1962, some years after the period in issue, made the subject of arbitration proceedings. Thus the record on this appeal does not show that the contract challenge was considered by the management to create a substantial business uncertainty during the years in issue for which provision was made.

■ Thus considering all the aspects of petitioner's business, and its uncertainties and hazards as revealed in the record, it cannot be said that the finding of the Tax Court that the accumulation was unreasonable is not properly and fully supported by the record.

The accumulation being found to be beyond the reasonable needs of the business, Section 533 of the 1954 Code then provides that this is determinative of the purpose to avoid income tax with respect to the stockholders, unless the corporation by the preponderance of the evidence shall prove the contrary. We have held that the avoidance purpose need not be the sole purpose. World Publishing Co. v. United States, 169 F.2d 186 (10th Cir.).

The petitioner urges that various plans for diversification and expansion of services or facilities were discussed.

■ The justification for the retention of earnings beyond the ordinary for anticipated particular purposes must be found in some clear action by the corporation. This would include the adoption of specific plans or programs. The purpose for retention thus must be expressed in some tangible way or by some action directed towards its fulfillment.

The record shows that petitioner considered several proposals for the diversification of the business to protect itself, but none of this was translated into a definite plan nor action. These proposals included investment in a printing plant, sale of merchandise to the Association members, new or additional machinery, a plan for savings by mail, and others. The only definite plan adopted was for the purchase of an additional mailing list. Action was taken to adopt this plan, and it was carried out in part. The Tax Court made allowance for this program.

As the Tax Court indicated the record fails to show any clear testimony or evidence by way of minutes or financial statements that the ideas for diversification or expansion "were in such stages of planning as would justify accumulation of earnings." The most that can be said is that several proposals were considered. Smoot Sand & Gravel Corp.

v. Com'r of Internal Revenue, 241 F.2d 197 (4th Cir.).

We thus agree with the statement of the Tax Court that " * * * considering all of the evidence, we have concluded that petitioner's plans were not sufficiently definite and feasible to meet the requirements of the regulations and the standards established in decided cases."

As indicated above the petitioner followed a very liberal dividend policy. During the years in question the percentage of cash dividends paid to net income were 1956, 60.01 per cent; 1957, 41.80 per cent; 1958, 66.94 per cent, and 1959, 62.35 per cent. Cash dividends from the inception of the business in 1928 amounted to 60.52 per cent of its net income after taxes. The salaries paid to the officer-shareholders were likewise substantial. Nevertheless the corporation continued to accumulate earnings and profits beyond its ordinary needs. The payment of large dividends and salaries cannot in itself serve to avoid the consequences of the statute. The controlling matter is the ultimate one—whether there was retained an unreasonable amount of profits or earnings. This is simply what the statute provides.

The Code provisions here concerned have a definite purpose adopted by Congress, and the decisions and the regulations have delineated how it is applied to particular fact situations. As all statutes in this field in order to be effectively applied, the taxpayer's intention, purpose, or aim must be demonstrable through some contemporaneous course of conduct, action, or record. The petitioner in the case at bar simply could not so show any more than its officers were concerned with the problems faced by the business, that the need to diversify was expressed, that protective devices were discussed. No plan was adopted and no action was taken other than the accumulation of earnings for unspecified purposes. This cannot be sufficient under the statute.

The petitioner further urges that the Tax Court should have granted its motion for reconsideration or for a new trial in view primarily of the arbitrator's statement of facts in the arbitration proceedings had as to its contract with the Postal Employees Association. The action by the Tax Court upon such a motion is clearly within its discretion. Mensik v. Com'r of Internal Revenue, 328 F.2d 147 (7th Cir.). It will not be disturbed except under the most aggravated circumstances showing a clear abuse of discretion, which are not here present.

Affirmed.