**OKLAHOMA PRESS PUBLISHING COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 483–69.

United States Court of Appeals, Tenth Circuit.

Feb. 12, 1971.

Ann E. Belanger, Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Gilbert E. Andrews, Dept. of Justice, Washington, D. C., and William J. Settle, U. S. Atty., of counsel, on the brief) for defendant-appellant.

John H. Conway, Jr., and Donald P. Moyers, Tulsa, Okl. (Martin, Logan, Moyers, Martin & Conway, Tulsa, Okl., of counsel, on the brief) for plaintiff-appellee.

Before LEWIS, Chief Judge, and HICKEY * and HOLLOWAY, Circuit Judges.

LEWIS **, Chief Judge.

This appeal involves the application of §§ 531–37 of the Internal Revenue Code of 1954, which impose a surtax on every corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed."

Appellee-taxpayer is a family-owned corporation organized under the laws of the state of Oklahoma and engaged in the publication of a daily newspaper and the operation of a radio station in Muskogee, Oklahoma. Beginning in 1943 and from time to time thereafter, the taxpayer established and has maintained a practice of providing out of its annual earnings reserves for various anticipated business needs. The district court found that this practice is in conformity with the general policy of taxpayer and other newspapers similarly situated, which believe it essential to maintain a complete independence, financial and professional, in their operations.

* Judge Hickey, since deceased, heard the arguments in this case but did not participate in this decision.

** By reassignment.

At the end of 1961, taxpayer's retained earnings amounted to $1,543,534. Of this amount, $1,077,584 was appropriated into various reserves, principally to cover equipment replacements, self-insurance, contingencies peculiar to the newspaper business, funding of a bond debt, radio station expansion, and contractual obligations of the corporation with its principal officer upon his retirement. At this time, taxpayer also enjoyed an excellent liquidity position as reflected in its investment of over $1,000,000 in United States Treasury securities and municipal bonds.

During the years 1962 to 1964 the corporation experienced high net earnings totaling $410,671 but declared dividends of only $12,500 per year. The remainder was retained in the business. The taxpayer made additional appropriations to its reserves during these three years: $150,000 for the proposed construction of a new office building, $150,000 for the remodeling of its old business and editorial offices, $100,000 for replacement of its printing press, and $20,000 for its principal officer's retirement benefits. Unappropriated retained earnings increased during this period from $465,950 to $519,768.

The Commissioner of Internal Revenue determined that taxpayer's retained earnings at the end of 1961 were sufficient for the needs of its business and therefore assessed accumulated earnings taxes against taxpayer for the years 1962 to 1964 in the respective amounts of $31,825, $31,891, and $58,999. Taxpayer paid the tax and brought this refund suit in the United States District Court for the Eastern District of Oklahoma. The court below found that taxpayer's accumulated earnings and profits did not exceed its reasonable needs, including its reasonably anticipated needs, and that taxpayer had specific, definite and feasible plans for the use of such accumulations. It concluded that

for the years 1962 through 1964, taxpayer corporation was not availed of for the purpose of avoiding income tax with respect to its shareholders.

■ The initial determination under the statute—whether the corporation has accumulated its earnings beyond its reasonable business needs, including its reasonably anticipated needs—is a finding of fact made by the trial court which must be sustained unless clearly erroneous. Henry Van Hummell, Inc. v. Commissioner, 10 Cir., 364 F.2d 746, cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102.

On appeal, the government strongly relies on Treas.Reg. § 1.537–1(b), which requires that in order to justify accumulation of earnings for reasonably anticipated needs, the corporation must have specific, definite and feasible plans for the use of its retained earnings and the execution of such plans must not be postponed indefinitely.[1]

■ Although recent decisions have tended to relax the standard of proof that taxpayer must meet in complying with the above regulation, see Dahlem Foundation, Inc. v. United States, 6 Cir., 405 F.2d 993; Electric Regulator Corp. v. Commissioner, 2 Cir., 336 F.2d 339; Sterling Distribs., Inc. v. United States, 5 Cir., 313 F.2d 803, some objective evidence is still necessary to demonstrate that taxpayer actually intends to carry out its spending program within a reasonable period of time. As stated in Henry Van Hummell, Inc. v. Commissioner, supra 364 F.2d at 750:

The justification for the retention of earnings beyond the ordinary for anticipated particular purposes must be found in some clear action by the corporation. This would include the adoption of specific plans or programs. The purpose for retention thus must be expressed in some tangible way or by some action directed toward its fulfillment.

---

1. The language of the Regulation is taken directly from the Committee Reports explaining the 1954 Internal Revenue Code.

See H.R.Rep.No.1337, 83d Cong., 2d Sess. 53 (1954); S.Rep.No.1622, 83d Cong., 2d Sess. 69 (1954).

With the above standard in mind, we now consider the evidence justifying taxpayer's accumulation of earnings.

Taxpayer originally established a new building reserve in 1954 for the proposed erection of a new building on the property located adjacent to taxpayer's newspaper plant, which property was owned by taxpayer but occupied by the Oklahoma Printing Company. In 1959 taxpayer abandoned its plans for a new building and used the $200,000 accumulated in that reserve to purchase a parking lot. During 1962 the new building reserve was reestablished, however, with an appropriation of $100,000, and in the following year $50,000 more was added to the reserve. It is these accumulations of income with which we are now concerned.

The officers of the corporation testified that the accumulated earnings were needed to construct a new office building because: (1) Urban Renewal might condemn the building presently located on the property, and (2) the town was expected to grow. No evidence was introduced, however, concerning the Urban Renewal program, and as it stands, the trial court could not possibly assess whether condemnation was a reasonable possibility. *See* Smoot Sand & Gravel Corp. v. Commissioner, 4 Cir., 241 F.2d 197, 205. But even assuming that the expected growth of the town would sustain a finding that the need for a new building was reasonably anticipated, the accumulation of earnings would not be justified unless there were specific and definite plans for its construction. This is especially true in the instant case because there is no evidence in the record that any part of taxpayer's proposed building is at all related to its business. To the contrary, the evidence shows that taxpayer contemplated the construction of rental property—a professional office building to be occupied by doctors or lawyers.

■ Although there is nothing unreasonable about the accumulation of earnings to finance the expansion of taxpay-

er's business into unrelated fields, Treas.Reg. § 1.537–3(a), the need for tangible evidence of corporate action directed toward fulfillment of the proposed project is probably most acute in this area since plans of this type can be easily fabricated and postponed for indefinite periods. In fact, the record in this case shows that taxpayer has been considering a new building off and on for a period of fifteen years without any ·material progress being made toward actual construction. The only evidence of any definite plans is the testimony of the corporation president that an architect had made several rough sketches of the proposed building. These are of little real substance, however, in light of taxpayer's admission at the time of trial that they were still unsure of the type of building to construct. Considering all the circumstances, we believe that the trial court's finding that taxpayer had specific, definite and feasible plans to construct a new building is clearly erroneous and cannot be sustained.

In 1964 taxpayer established a reserve of $150,000 to cover the remodeling of its business and editorial offices. No work of this kind had been done previously, and the government does not dispute the actual need therefor. The essential question is whether taxpayer had specific plans for such remodeling during 1964. The only evidence presented by taxpayer on this point is contained in the testimony of Mr. Tams Bixby, III, the vice president of the corporation, that they intended "complete remodeling of front offices, it was quite an elaborate system, we were going to, at that time, obtain a large globe from Rand McNally, we were going to install an elevator, do a number of things that would have been quite impressive, I think." This testimony, standing alone, does not in our opinion demonstrate that taxpayer had definite remodeling plans during 1964. Not only has taxpayer failed to produce any written plans, cost estimates or correspondence from that period, but also there is a complete ab-

sence of any corporate minutes even discussing the problem of remodeling. In short, no evidence whatsoever of "clear action" by the corporation has been presented.

■ Taxpayer stresses that in 1967 or 1968 an architect was employed to draw up plans and a contract was entered into with a construction company for remodeling work.[2] No explanation was given, however, as to why the corporation delayed for three to four years before taking action. And in any event, taxpayer's plans must be assessed as of 1964, the year that earnings were accumulated for remodeling purposes. "Subsequent events are relevant only as they throw light on the period in question." KOMA, Inc. v. Commissioner, 10 Cir., 189 F.2d 390, 396. There is simply no evidence that taxpayer had specific and definite plans for remodeling at the time earnings were accumulated therefor.

Even if we were to consider taxpayer's actions in later years, there is still insufficient proof to justify the $150,000 set aside for remodeling purposes. No cost estimates were ever submitted by taxpayer, and the contract entered into with the construction company was for only $83,000. Although taxpayer claimed that the contract price did not include certain items originally contemplated in establishing the remodeling reserve, no proof was offered as to the reasonable cost of these other items. Taxpayer clearly did not meet its burden of proof in this respect.

Since 1946 taxpayer has maintained a reserve for press replacement, adding $50,000 in 1962 and again in 1963 to bring the total amount of this reserve up to $450,000. Taxpayer's actual need for new or updated printing equipment is not contested by the government. The evidence shows that the press now in use is over forty years old, runs inefficiently, and has suffered major breakdowns.

The government initially attacks the absence of formal cost estimates during the tax years in issue to substantiate the additions to the press reserve. The $450,000 total of the reserve is adequately substantiated, however, by correspondence dating back to 1953 that indicated a new press would cost $425,000 and by a formal cost estimate of $610,860 obtained in 1966, which showed that the price of new printing equipment had been rising sharply.

■ The main difficulty in sustaining the press replacement reserve is the total lack of evidence that any corporate action was taken to replace the old printing press during the tax years in issue and even up to the time of trial. But unlike the other challenged reserves, we believe that the evidence in this instance is sufficient to sustain the trial court's finding that taxpayer had specific, definite and feasible plans for press replacement during the tax years in question.

In the first place, there is no doubt that taxpayer has always intended to purchase a new press. It is perhaps the most essential piece of equipment in taxpayer's business and must necessarily be replaced when it wears out. Thus, taxpayer's plans for press replacement should be considered definite at least as regards the intent to replace that particular equipment.

■ The only remaining question is whether replacement would be made in the near future or could be postponed indefinitely. In the latter instance, accumulation of earnings is clearly not within the reasonably anticipated needs of the business. *See* Henry Van Hummell, Inc., 23 CCH T.C.Memo. 1765, 1781–83, affd, 10 Cir., 364 F.2d 746. But the evidence in this case indicates that during the tax years in issue the press being used was virtually worn out —the time for its replacement would be reasonably soon, not in the distant future.

---

2.  At the time of trial this remodeling work had been stopped, and taxpayer could give no definite time when it would be resumed.

■ Although taxpayer had not committed itself to purchase a specific type of press by a specific date, such corporate action is not essential under the circumstances. There was an imperative need to replace the old printing press and the intention that it would be done in the regular course of business, and that, we think is sufficient. *See* Sterling Distribs., Inc. v. United States, *supra*; Mohawk Paper Mills, Inc. v. United States, N.D.N.Y., 262 F.Supp. 365, 371–372.

We must next consider taxpayer's unappropriated retained earnings, which increased from $465,950 to $519,768 during the years 1962–64. The trial court found that taxpayer's annual operating expenses averaged approximately $857,-000 and that its working capital needs required retained earnings of one-half of this amount $429,000). Such determination is supported by the evidence. The trial court further found that the remaining $90,000 of unappropriated retained earnings would be needed to cover the cost of items for which earnings had been appropriated in conservative amounts. The court did not specify, however, which appropriations were conservative and by what amounts. Since we have determined that some of taxpayer's appropriations are not justified as within the reasonably anticipated needs of the business, we must remand for a specific finding as to which appropriated earnings are conservative and by what amount.

The officer's retirement reserve relates to the corporation's 1948 and 1954 agreement to pay $12,000 a year to the corporate president upon his retirement, or to his wife upon his death. The agreement also called for taxpayer to set aside a sinking fund of $10,000 per year to provide for the anticipated payments unless the company purchased life insurance or endowment policies that would provide for such payments. By the end of 1957, the sinking fund reserve amounted to $100,000. No further additions were made to this reserve until 1962, when taxpayer appropriated $20,000 thereto. Taxpayer also owned a $25,-000 life insurance policy on the life of its president, which had a cash surrender value of $26,760 at the end of 1961.

■ In this instance, the government does not argue that taxpayer has no need for a reserve or that the anticipated commitment is not definite enough but rather that the taxpayer has not justified the amount of retained earnings necessary to satisfy its need. We must agree with the government. In view of the pre-existing accumulation of earnings and the life insurance policy on the president's life, taxpayer had the burden of explaining why further additions to the retirement reserve were necessary during the tax years in question. It may be possible for taxpayer to justify the total amount of the reserve by reference to a joint and survivor annuity table, such as contained in Treas.Reg. § 1.72–9, but nowhere in the record are the ages of the corporate president and his wife to be found. At trial, no evidence other than the agreement itself was introduced. We therefore cannot sustain, under the present record, the trial court's finding that the 1962 addition of $20,000 to the retirement reserve was within the reasonable needs of the business. Further evidence on this issue should not be foreclosed on remand.

The final determination which must be reviewed is whether taxpayer was availed of for the purpose of avoiding income tax with respect to its shareholders by accumulating earnings. The trial court found there was no such purpose. As to the retained earnings justified by the reasonable needs of the business, a review is unnecessary since § 535 of the Internal Revenue Code provides a credit for such accumulated earnings. But as to the earnings retained by taxpayer for a new office building, remodeling and retirement benefits, which we have determined cannot be justified as within the reasonable needs of taxpayer's business, § 533(a) of the Internal Revenue Code has made the tax avoidance purpose conclusive "unless the corporation

by the preponderance of the evidence shall prove to the contrary."

 The only justification offered by taxpayer for the retention of its earnings during the years involved was that such retention was required for the future but indefinite needs of the business. Since the evidence does not support wholly this justification, taxpayer has failed to negative the tax avoidance purpose made presumptive through operation of § 533(a).

The case is remanded to the district court for further proceedings in accord with the views herein expressed and a recomputation of the allowable judgment.