THE CHEYENNE NEWSPAPERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Cheyenne Newspapers, Inc. v. Commissioner
Docket No. 1688-69
United States Tax Court
T.C. Memo 1973-52; 1973 Tax Ct. Memo LEXIS 237; 32 T.C.M. (CCH) 234; T.C.M. (RIA) 73052; February 27, 1973, Filed Gene W. Reardon, for the petitioner. Charles H. Powers, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years and in the amounts as follows: Year
Amount
1965
$32,109.68
1966
31,191.00
1967
12,638.00 2 The sole issue for decision is whether, for each of the years in issue, petitioner was formed or availed of for the purpose of avoiding income taxes with respect to its shareholders by permitting earnings and profits to be accumulated instead of being divided or distributed, and is, therefore subject to the accumulated earnings tax imposed by section 531, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The Cheyenne Newspapers, Inc. (hereinafter referred *239 to as petitioner) is a corporation incorporated under the laws of the State of Wyoming. Petitioner's principal place of business at the time of the filing of the petition herein was Cheyenne, Wyoming. Petitioner keeps its books and records and files its income tax returns on the cash method of accounting. Petitioner filed timely Federal income tax returns for the calendar years 1965, 1966, and 1967 with the district director of internal revenue, Cheyenne, Wyoming. Petitioner has been engaged in the business of publishing newspapers in Cheyenne, Wyoming since 1928. During the taxable years in issue petitioner published a morning newspaper, the Wyoming Eagle, each Tuesday through Saturday, and a daily evening newspaper, the Wyoming State Tribune. [2] Neither paper published a Sunday edition during the taxable years in issue. 3 In September 1968, petitioner commenced publication of a Sunday newspaper under the combined name, Sunday Wyoming Tribune-Eagle. There were separate editorial staffs for the Wyoming Eagle and the Wyoming State Tribune. *240 A third editorial staff was added when publication of the Sunday edition commenced. Petitioner's newspapers are sold or circulated in Cheyenne and the surrounding areas. The newspapers have a combined daily circulation of about 22,000. Petitioner's authorized capital stock consisted of 5,000 shares of common stock. As of the close of the taxable years 1965, 1966, and 1967, 350 shares were held as treasury stock, 1667 shares were unissued, and 2,983 shares were held by the following individuals: 1965
1966
1967
Lillian D. McCraken
655
655
655
Robert S. McCraken
591
591
591
William D. McCraken
560
560
560
Harry A. McCraken, Deceased
3
0
0
Margaret E. McCraken
0
3
3
O. B. Koerfer
104
104
104
Fred A. McCabe
288
288
288
Jessie T. Snow
40
40
40
R. J. Hofmann
113
113
113
D. E. Woodson
113
113
113
W. A. Corson
113
113
113
Frank H. Ricketson, Jr.
132
132
132
Raymond F. List
95
95
95
Marguerite P. List
10
10
10
T. Ray Cahalane
87
87
87
William C. Grove
34
34
34
Warren W. Hoefer
25
25
25
Bernard F. Horton
8
8
8
D. G. Richardson
4
4
4
Hugh Knoefel
4
4
4
Robert Johnson
4
4
4
Total
2,983
2,983
2,983
*241 4 Lillian McCraken is the mother of Robert S. McCraken and William D. McCraken. The shareholders set forth above beginning with O. B. Koerfer and extending to the end of the list of stockholders are not related to the McCraken family. The McCraken family owned 60.54 percent and Fred A. McCabe owned 9.65 percent of the outstanding capital stock of petitioner. Thus 70.19 percent of petitioner's stock was owned and controlled by the McCraken's and McCabe. Petitioner's officers and their salaries for the taxable years in issue were as follows: Name
Title
Salary
1965
Robert S. McCraken
President
$25,270.00
Fred A. McCabe
V. president-secretary
24,898.00
T. R. Cahalane
Treasurer
16,950.00
1966
Robert S. McCraken
President
25,480.00
Fred A. McCabe
V. president-secretary
24,938.00
T. R. Cahalane
Treasurer
17,520.00
1967
Robert S. McCraken
President
24,180.00
W. W. Hoerfer
V. president-secretary
23,050.00
T. R. Cahalane
Treasurer
16,780.00
Fred A. McCabe
(Part of year v. president and secretary)
13,089.00
Petitioner has never made any loans to any of the above-named officers or stockholders. Petitioner has never borrowed *242 any money and has had a policy against borrowing since it has sought to remain unobligated to lending institutions, corporations, or any 5 individuals. Petitioner's policy and practice has been motivated out of a desire to have the publication of its newspapers remain completely independent. The following schedule reflects petitioner's taxable income for the taxable years 1962 through 1967: Year
Taxable income
1962
$227,064.60
1963
206,605.09
1964
277,468.78
1965
269,921.99
1966
262,836.00
1967
137,049.00
Petitioner's operating expenses for each of the taxable years in issue were as follows: Year ended December 31
1965
1966
1967
Cost of operations
$1,000,036.22
$1,019,176.00
$1,000,243.00
Other expenses - excluding depreciation
223,091.81
218,503.00
240,146.00
Operating expense for year
$1,223,128.03
$1,237,679.00
$1,240,289.00
Petitioner has a consistent history of making dividend distributions. Petitioner paid dividends in the following amounts for each of the taxable years in issue: Year
Amount
1965
$59,860.00
1966
59,660.00
1967
59,660.00 6 In each of the taxable *243 years in issue petitioner had current accumulations in earnings in the following amounts [3] Taxable year ended December 31
Amount
1965
$111,973.20
1966
109,586.00
1967
45,958.00
Petitioner had total accumulations of earnings and profits at the close of each taxable year in issue as follows: Taxable year ended December 31
Amount
1965
$1,080,032.15
1966
1,189,618.15
1967
1,235,576.15
Had the entire amount of accumulations of earnings made in the 3 years in issue been distributed, the additional income tax resulting to petitioner's major shareholders would have been in the amounts set forth below. 7 Shareholder
Year
Additional income
Additional tax
Total
Lillian McCraken
1965
$24,582.15
16,072.64
Robert McCraken
22,180.23
12,912.55
William McCraken
21,016.80
10,456.87
Fred McCabe
10,808.64
4,558.45
$ 44,000.51
Lillian McCraken
1966
24,058.15
15,499.32
Robert McCraken
21,727.43
12,710.76
William McCraken
20,568.80
10,271.43
Fred McCabe
10,578.24
4,579.62
$ 43,061.13
Lillian McCracken
1967
10,093.55
6,270.15
Robert McCraken
9,107.31
5,282.24
William McCraken
8,629.60
4,289.74
Fred McCabe
4,438.08
1,068.28
$ 16,910.41
Total increase in tax liability resulting from distribution
$103,972.05
*244 At the close of each of the taxable years in issue petitioner held the following items of cash and liquid assets: Taxable year ended December 31
1965
1966
1967
Cash on hand and in banks
$220,026.43
$280,049.13
$280,235.35
Savings accounts
155,000.00
155,000.00
155,000.00
Certificate of deposit
45,235.39
-
-
Government obligations
30,659.80
30,659.80
30,659.80
$450,921.62
$465,708.93
$465,895.15
During the taxable years 1965, 1966, and 1967 petitioner owned shares of stock and securities. The following schedule reflects the book value of petitioner's holdings at the close of each of these taxable years: 8 Taxable year ended December 31
1965
1966
1967
Marketable securities: [1]
El Paso Natural Gas Co.
$ 4,800.00
$ 4,800.00
$ 4,800.00
Sinclair Oil
4,512.50
4,512.50
4,512.50
Denver U.S. Bancorporation
7,914.98
7,914.98
7,914.98
Union Pacific Railroad
19,925.00
19.925.00
19,925.00
American Tel and Tel Co.
44,123.11
44,123.11
44,123.11
Mountain Fuel Supply
7,102.00
7,102.00
7,102.00
General Motors
15,282.09
15,282.09
15,282.09
First National City Bank of New York
7,682.81
7,682.81
7,682.81
Pacific Power and Light
16,525.00
16,525.00
16,525.00
Southwest Public Service Co.
3,649.76
3,649.76
3,649.76
Mountain States Telephone
6,284.00
6,284.00
6,284.00
Total
$137,801.25
$137,801.25
$137,801.25
Other stocks and securities:
Airport terminal
1,000.00
1,000.00
1,000.00
Cheyenne Junior Achievement
300.00
Scottsbluff Building Co.
5,120.64
5,120.64
5,120.64
West Tacoma Newsprint Co.
21,000.00
21,000.00
21,000.00
Worland Building Co.
10,937.50
10,937.50
10,937.50
WYNECO, Inc.
17,670.00
17,670.00
17,670.00
Frontier Broadcasting Co.
36,185.00
45,546.00
63,025.00
Total
$91,913.14
$101,274.14
$119,053.14
*245 Petitioner owned 1,885 (approximately 23 percent) of the shares of Frontier Broadcasting Co. as of December 31, 1965; 1,995 shares as of December 31, 1966; and 2,045 shares as of December 31, 1967. Frontier Broadcasting Co. is a television broadcasting company operating in Sterling (Colorado), Scottsbluff (Nebraska), and Cheyenne, Wyoming. 9 Petitioner owned 889 shares (or approximately 12 percent) of Scottsbluff Building Co. which had 7,591-1/2 shares issued and outstanding. Scottsbluff Building Co. rents a building for Frontier Broadcasting Co. in Scottsbluff, Nebraska. Petitioner owned 1,767 shares of the 10,000 outstanding shares of stock of WYNECO, Inc. WYNECO operated a microwave system related to the operations of Frontier Broadcasting Co. Petitioner owned 125 shares of Worland Building Co. which owned a building used by Bighorn Basin *246 Newspapers. Petitioner held no interest in Bighorn Basin Newspapers, but the McCraken family did have an interest in Bighorn Basin Newspapers. Petitioner owned 210 shares of West Tacoma Newsprint which it had acquired shortly after World War II to guarantee that it would have a source of supply for newsprint. The following schedule reflects petitioner's current liabilities at the close of each of the taxable years in issue: Taxable year ended December 31 Current Liabilities:
1965
1966
1967
Payroll taxes
$ 18,644.33
20,234.00
$21,861.00
Carrier boy deposits
3,595.15
3,143.00
3,237.00
Income tax payable (net after prepayment)
106,562.55
102,383.00
38,196.00
Total current liabilities
$128,802.03
125,760.00
63,294.00
Petitioner billed for advertising at the end of each month except in the case of a few of its larger advertisers who had special billing requirements. All advertising bills were payable by the 10th of the month. Most accounts were paid within 30 days with only a small minority running over that time. 10 Petitioner paid most of its accounts payable on the 10th day of every month. Some special bills such as feature *247 services were paid on a weekly basis. During the taxable years in issue but prior to April 16, 1966, petitioner leased its business premises located at 110 East 17th Street, Cheyenne, Wyoming, from Cheyenne Building Company, a Wyoming corporation. On April 16, 1966, Cheyenne Building Company and petitioners executed a lease for the premises for a term of 15 years commencing on the date of execution and ending on April 15, 1981. Under the terms of the lease petitioner obligated itself to pay the sum of $363,600 over the term of the lease with $1,010 payable on the date of execution and $2,020 payable on the third day of each month until April 3, 1981, when the final payment of $1,010 was payable. As early as 1963 petitioner's directors began to consider the need to expand and remodel its building. There was a proposal to purchase a new intertype headcasting machine at a cost of $28,000 and a Sta-Hi mat cooker costing $1,500. The discussions of the proposed remodeling and purchase of the two machines are reflected in the formal minutes of meetings of the board of directors for 1963 and subsequent years. In June 1965 petitioner commenced the expansion and remodeling of *248 the building it occupied. It was anticipated that the total cost of the project including architectural fees, equipment and furnishings would exceed $450,000. 11 The following schedule reflects the expenditures made by petitioner during the taxable years in issue for the expansion and remodeling of its facilities: 1965
1966
1967
Shop machinery and equipment
$ 990.00
$ 6,160.70
$ 8,028.58
Photo and engraving equipment
56.05
707.00
Office furniture and equipment
1,179.10
10,387.49
2,930.19
Leasehold improvements
289,572.63
112,396.78
1,601.54
Total
$291,797.78
$129,651.97
$12,560.31
During the years here in issue petitioner's papers were printed on letter presses. Equipment salesmen from time to time approached the members of petitioner's executive committee with regard to the possibility of petitioner's acquiring an offset press. In early 1970 petitioner's controller obtained an estimate of $396,845 as the cost of an offset press. He estimated in 1970 that if the offset press were to be installed, it would be necessary for petitioner to make the following expenditures: Offset press
$396,845
Offset press processing cameras
20,000
Dark rooms
10,000
Compugraphic equipment (4 machines)
55,880
Basement remodeling
10,000
Leasehold improvements
146,962
Sunday edition
143,000
Total
$782,687
*249 Petitioner's directors in late 1963 began to consider the feasibility of establishing a Sunday newspaper and minutes of the meetings of the board of directors during this period and during 1964 reflect that feasibility studies with respect to publishing a Sunday paper were made. In these studies, consideration was given to staff organization, feature 12 services, and comic sections. No further discussion of a Sunday paper is contained in the minutes of the meetings of the board of directors until September 1967, at which time the directors directed that a greater in-depth study of a Sunday edition be made. The first Sunday edition of the paper was published in September 1968. Petitioner negotiated and entered into a labor contract with the union representing its employees in June 1963. The contract was for a period of 3 years and expired in June 1966 and was characterized by petitioner's directors as the best labor union settlement in petitioner's history. Petitioner's employees have not been out on strike in 20 years. Petitioner does not and cannot have a closed shop because of Wyoming's "right to work" law. In order for petitioner to retain its second class mail *250 permit it must maintain continuity in its newspaper publication. In the event that continuity is not maintained petitioner's permit could be revoked. However, in the event of a cessation of publication resulting from a disaster (such as the one which petitioner faced in 1949 as a result of a blizzard), a mechanical breakdown, or other good reasons, an application could be filed with the Post Office Department requesting that the permit not be withdrawn or suspended. Petitioner has never had to file such an application. For at least the past 33 years petitioner has not had a mechanical breakdown. In accordance with the provisions of section 534, respondent notified petitioner by certified mail on October 31, 1968, of his proposal to issue a statutory notice of deficiency and to assert an 13 accumulated earnings tax for the years 1965, 1966, and 1967, and therein advised petitioner that within 60 days after the mailing of this notification, petitioner could submit a statement of the grounds relied upon to establish that all or any part of the earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of the business. Petitioner did not *251 file a statement of the grounds on which it relies to establish that all or a part of the earnings and profits had not been permitted to accumulate beyond the reasonable needs of the business. In his statutory notice of deficiency respondent determined that no portion of petitioner's current earnings and profits was retained for the reasonable needs of its business and that petitioner was liable for the accumulated earnings tax imposed by section 531 in the amounts of $32,109.68, $31,191.00, and $12,638.00 for the taxable years ended December 31, 1965, December 31, 1966, and December 31, 1967, respectively. 14 OPINION Section 531 imposes an accumulated earnings tax on corporations which section 532 makes subject to the tax. [4]
*252 15 Section 532 provides that every corporation "formed or availed or for the purpose of avoiding the income tax with respect to its shareholders" by permitting earnings and profits to accumulate rather than 16 being divided or distributed shall be subject to the tax. Section 533 provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of the purpose to avoid income tax of its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence, and section 537 defines the term "reasonable needs of the business" to include the "reasonably anticipated" needs of such business. Section 534 provides for circumstances in which the burden of proof regarding the reasonable needs of the business is placed on respondent. However, since petitioner did not submit a statement of the grounds upon which it relied to establish that its earnings and profits were not permitted to accumulate beyond the reasonable needs of its business as required by section 534(c), petitioner in this case has the burden of proof with respect to the reasonable needs of its business. 17 *253 Whether accumulations of earnings are beyond the reasonable needs of a taxpayer's business is essentially a question of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1935).In determining whether any portion of current earnings and profits is for the reasonable needs of a taxpayer's business, it is necessary to determine whether prior accumulations are sufficient for this purpose, which requires an analysis of the nature as well as the amount of the prior accumulation. Bremerton Sun Publishing Co., 44 T.C. 566, 582 (1965). The determination of the reasonable needs of the business must be made on the basis of the facts and circumstances existing in the year in issue and not by the events transpiring in subsequent years except to the extent that such events may throw a light upon the facts as they existed in the year in issue. Sterling Distributors, Inc. v. United States, 313 F. 2d 803, 807 (C.A. 5, 1963); and Dixie, Inc., 31 T.C. 415, 430 (1958), affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960). Petitioner contends that the accumulations in the years in issue were (1) to *254 meet working capital needs and provide for such needs under unstable industrial conditions caused by natural disasters, mechanical breakdowns and labor strikes, and (2) to finance the remodeling and expansion of petitioner's facilities. Respondent contends (1) that petitioner's accumulations from prior years were more than sufficient to meet its working capital needs; and (2) that petitioner had no specific, definite, and feasible plans for remodeling and expansion other than the leasehold improvements and related changes made and paid for during the years in issue. 18 Respondent contends that after paying for the improvements made in the years in issue petitioner at the end of each such year had available a sufficient amount of current assets over current liabilities for its working capital needs and that its stock investments were readily convertible to cash if additional cash funds should be needed. Petitioner argues that it should be allowed to have an accumulation of earnings equal to its working capital needs for a 6-month period which amount petitioner calculates to be $616,866. In the past we have relied on several "rules of thumb" for measuring the reasonable working *255 capital need of a taxpayer. Bremerton Sun Publishing Co., supra, at 586. One such rule of thumb which we have applied is that a ratio of current assets to current liabilities of approximately 2.5 to 1 or less is an indication that the accumulation of earnings and profits is not unreasonable. John P. Scripps Newspapers, 44 T.C. 453, 471 (1965), and Bremerton Sun Publishing Co., supra.More recently, we have allowed as reasonable an accumulation of earnings equal to the expected costs for a single "operating cycle" for a taxpayer's business. Magic Mart, Inc., 51 T.C. 775, 792 (1969). However, the working capital requirements of various businesses differ as a result of dissimilar economic environments and conditions, and therefore, any rule of thumb is no more than a rule of administrative convenience. Dixie, Inc. v. Commissioner, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958). 19 Examination of petitioner's ratio of current assets to current liabilities reflects a ratio in excess of 5 to 1, [5] or twice the amount considered to be reasonable under the rule of thumb. *256 The record does not contain the facts necessary to precisely compute petitioner's working capital requirements for a single operating cycle. However, because of the nature of petitioner's business, such a computation would have very little value if it could be made from the record. Petitioner's income is primarily from advertising and subscriptions. Apparently, its only inventory was of the paper on which the newspapers were printed and comparable supply items. The indication from the record is that the cost of a year's supply of such items was 15 percent of petitioner's yearly operating costs. The record shows that most of petitioner's advertising accounts were billed at the end of the month. The accounts were due on the 10th of the month and most were paid within 30 days. The facts here show that petitioner had need to retain earnings for working capital for a relatively short period as compared to businesses which had product inventories and doubtful receivables. See Motor Fuel Carriers, Inc. v. United States, 322 F. 2d 576 (C.A. 5, 1963). On the basis of all the evidence of record we conclude that petitioner had need for accumulation of earnings for working *257 capital for a 20 period not in excess of 90 days and in only approximately one-half of the amount claimed by petitioner, or $313,433. [6]
Petitioner contends that an accumulation of earnings and profits should be allowed to provide sufficient working capital to meet the contingencies arising from natural disasters, mechanical breakdown, and labor strikes. We have recognized that the existence of unstable industrial conditions, including the threat of strike, presents a justification for the accumulation of earnings and profits. Dielectric Materials Co., 57 T.C. 587, 599 (1972). However, the contingencies which justify additional accumulations of earnings must be present or pending and not merely remote possibilities or unrealistic hazards. j. Gordon Turnbull, Inc., 41 T.C. 358, 374-375 (1963), *258 affirmed 373 F. 2d 87 (C.A. 5, 1967), certiorari denied 389 U.S. 842 (1967); Section 1.537-2(c) (5), Income Tax Regs.
Petitioner has cited only one instance in which it was confronted by a natural disaster in the form of a blizzard. This was in 1949 and petitioner continued to publish without advertising for a period of a few days. Petitioner has not shown that it ever had a mechanical breakdown which prevented publication of its newspapers and the record affirmatively shows that it has had no such breakdown in the last 33 years. The record further shows that in the event of 21 the cessation of publication occasioned by reasonably explainable circumstances an application filed with the Post Office Department requesting that petitioner's mail permit not be withdrawn would quite likely be granted. The record indicates that the threat of a labor dispute was very remote. Petitioner negotiated a labor contract in 1963 which it characterized as favorable and which was in force at least midway through 1966. Petitioner's employees had not been out on strike in 20 years. We conclude that the contingencies which petitioner cites as necessitating it to *259 retain earnings for working capital for a 6-month period are remote and fail to support petitioner's contention that it had need of an accumulation of earnings and profits to meet working capital requirements for a period of time in excess of 90 days. Petitioner contends that during the taxable years in issue it anticipated future expenditures of $782,687 in furtherance of its plans of remodeling and expansion and that accumulations of earnings during these years were to provide for such remodeling and expansion. Respondent's regulations specifically provide that reasonable accumulations of earnings and profits may be had to provide for bona fide expansion of business or replacement of plant. Section 1.537-2(b) (1), Income Tax Regs.However, such grounds for reasonable accumulations of earnings and profits must satisfy the requirements of section 1.537-1(b) (1), Income Tax Regs., which provides in part: 22 In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible *260 plans for the use of such accumulation. The regulations further provide that the requirement of a specific, definite, and feasible plan does not necessitate the expenditure of accumulated earnings immediately, "nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business." Section 1.537-1(b) (1), Income Tax Regs.
Petitioner has failed to demonstrate the existence of a specific, definite, and feasible plan of remodeling or expansion over and above the expansion done with the approximately $450,000 actually expended during the 3 years in issue. As stated in Henry Van Hummel, Inc. v. Commissioner, 364 F. 2d 746, 750 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 386 U.S. 956 (1967): The justification for the retention of earnings beyond the ordinary for anticipated particular purposes must be found in some clear action by the corporation. This would include the adoption of specific plans or programs. The purpose for *261 retention thus must be expressed in some tangible way or by some action directed toward its fulfillment. There is a conspicuous absence of evidence of corporate action directed toward the acquisition of an offset press or any remodeling and expansion in connection therewith which petitioner claims justified the further accumulation of earnings. Petitioner bases its 23 contention on the testimony of its treasurer. This testimony is vague and totally fails to support any plan during the years here in issue for remodeling and expansion at an anticipated cost of $782,687. The brochures and blueprints on which petitioner's treasurer relied for support of his testimony were dated "1-23-70." The evidence herein fails to demonstrate the existence of a specific, definite, and feasible plan during the years in issue. See Oklahoma Press Publishing Company v. United States, 437 F. 2d 1275, 1277-1279 (C.A. 10, 1971), and Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, 80-81 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court. Furthermore, there are clear indications in the record that an expansion program involving the purchase of an offset *262 press was not even under consideration by petitioner during the years here in issue. Petitioner's treasurer testified that "we had just finished remodeling our building when we decided this need was there." The record shows that the remodeling of petitioner's building was not substantially completed until October of 1966 and was not fully completed for some time thereafter. This witness testified that further substantial changes in the building were needed to accommodate an offset press. When the fact that the minutes of the meetings of the directors refer a number of times to the remodeling done during the years in issue but make no reference to an offset press is considered in conjunction with the fact that further remodeling of the building would be needed to accommodate an offset press, the inference is that 24 during the years in issue petitioner was not considering acquiring an offset press. While consideration of publication of a Sunday edition is mentioned in petitioner's minutes for years prior to those here in issue, there is no mention of consideration of such a publication during the years here in issue until the latter part of 1967 when petitioner's directors *263 authorized an in-depth feasibility study with respect to publishing a Sunday edition. The record contains little evidence with respect to publication of a Sunday edition, but such evidence as is in the record on this subject indicates that petitioner had no specific, definite, and feasible plan during the taxable years in issue to establish a Sunday edition. Nevertheless, even if such a plan, though not adequately documented, did exist, there was ample accumulation of earnings from prior years to meet petitioner's envisioned needs of $143,000. Petitioner makes some contention that its current earnings for each year should be reduced by the amounts it expended in that year for remodeling. Petitioner bases this contention on the provisions of section 535(c) (1) that "the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * * ." Petitioner apparently overlooks the fact that where the earnings accumulated in prior years are sufficient for the reasonable needs of the business, there is no need to accumulate current earnings for this purpose and therefore no need to *264 25 retain any part of current earnings for this purpose so as to be entitled to the section 535(c) (1) credit. See Bremerton Publishing Co., supra, at 566, and J. Gordon Turnbull, Inc., supra, at 376-377. The facts in this case show that prior accumulations were more than adequate for the expansion which was currently paid for in each year, still leaving at the close of such year adequate available assets in cash or investments quickly convertible to cash for any reasonable needs of petitioner's business during the ensuing years. Based upon the record before us, we conclude that petitioner's accumulation of earnings and profits during the taxable years in issue were beyond the reasonable needs of petitioner's business. The fact that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of the business is determinative that petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders unless petitioner proves otherwise by a preponderance of the evidence. Section 533; United States v. Donruss Co., 393 U.S. 297 (1969). This record contains no evidence to overcome the presumption *265 of the prohibited purpose and in fact the available evidence indicates that petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders. On the basis of the record as a whole, we conclude that petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders and is subject to the accumulated earnings tax imposed by section 531. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954. ↩
2. The Wyoming Stockman-Farmer was published by Wyoming Stockman-Farmer, Inc., an 80 percent owned subsidiary of petitioner. ↩
3. The current accumulations in earnings and profits reflect adjustments made to those figures shown in petitioner's returns in respondent's notice of deficiency. ↩
1. The marketable securities held by petitioner are reflected at book value rather than at fair market value since in many instances the fair market value is not available in the record.For the stocks for which fair market value is available, the total fair market value at the end of each year was in excess of book value. ↩
4. n4Secs. 531 through 535 and sec. 537, I.R.C. 1954, provide insofar as here pertinent: SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27-1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38-1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * * SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the face that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * * SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - 15 (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531 * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * * SEC. 535.ACCUMULATED TAXABLE INCOME (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus * * * the accumulated earnings credit (as defined in subjection (c)). (b) Adjustments to Taxable Income - For purposes of subsection (a) taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year * * * * * * (c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, * * * (2) Minimum credit. - The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year. * * * SEC. 537. REASONABLE NEEDS OF THE BUSINESS. For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. ↩
5. n5Our computation of petitioner's ratio of current assets to current liabilities does not include as current assets the preferred stock held by petitioner nor the stock of West Tacoma Newsprint Co., which was purchased to insure a supply source of newsprint. Bremerton Sun Publishing Co., 44 T.C. 566, 587↩ (1965). 6. n6However, even if we were to accept petitioner's contention that it required accumulations of earnings equal to one-half of the amount of its annual expenses in order to have adequate working capital, which we do not, we would still conclude that its earnings and profits accumulated in years prior to those in issue were more than sufficient to meet such working capital needs. ↩